UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――X
STATE OF NEW YORK, THE NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, and JOSEPH MARTENS, as
Commissioner of the New York State
Department of Environmental Conservation,

Plaintiffs,

-against-

GENERAL ELECTRIC COMPANY,

Defendant.
―――――――――――――――――――――――X

Case No. 1:14-cv-747 (TJM/RFT)

COMPLAINT

The State of New York, the New York State Department of Environmental Conservation (DEC), and DEC Commissioner Joseph Martens (collectively referred to as the State), by their attorney, Eric T. Schneiderman, Attorney General of the State of New York, for their complaint allege as follows:

PRELIMINARY STATEMENT

1.  This is an action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, to recover certain costs incurred by the State in responding to releases of hazardous substances at a site known as the Luzerne Road Site, located at 51 and 53 Luzerne Road, in the Town of Queensbury, Warren County, New York (the Site). These releases have contaminated soil and groundwater at and in the vicinity of the Site with polychlorinated biphenyls (PCBs), volatile organic compounds (VOCs) and other hazardous substances.

1

2. Plaintiffs seek a declaratory judgment that defendant General Electric Company (GE) is liable for certain past response costs incurred by the State in responding to the release of hazardous substances at the Site, and an order requiring defendant to abate a public nuisance and to reimburse the State for response costs.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to CERCLA §§ 107(a) and 113(b), 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1331. This Court has supplemental jurisdiction, under 28 U.S.C. § 1367, for the remaining related claim, which is based on New York common law and arise out of a common nucleus of operative facts shared with the federal claims and are part of the same controversy. This Court also has jurisdiction to enter a declaratory judgment and further necessary or proper relief under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 9613(g)(2).

4. Venue is proper in this District pursuant to CERCLA Section 113(b), 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the releases of hazardous substances at issue occurred, and the claims alleged herein, arose in this District.

## PARTIES

5. Plaintiff State, as a body politic and sovereign entity, brings this action on behalf of itself and as *parens patriae*, trustee, guardian, and representative of all residents and citizens of the State, including those individuals who live in the vicinity of the Site.

6. Plaintiffs DEC and Commissioner Joseph Martens bring this action pursuant to 42 U.S.C. § 9607(a), to recover certain costs that the State has incurred in remediating the Site and impacted off-Site areas where hazardous substances have migrated.

7. At all relevant times, defendant GE is and has been a corporation established under the laws of New York, authorized to do business in this State with places of business in Hudson Falls, New York, Fort Edward, New York, and other locations in New York.

8. GE is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

## THE SITE

9. The Luzerne Road Site is approximately nine acres in size and consists of two adjacent parcels located at 51 Luzerne Road and 53 Luzerne Road in the Town of Queensbury. The Site is in an area of residential and light industrial/commercial properties. The 51 Luzerne Road property is owned by the State, while the adjacent 53 Luzerne Road property is owned by a private party.

10. From 1951 to 1976, the 53 Luzerne Road property was owned by Richard Alkes and Roslyn Alkes. During this time period, the 53 Luzerne Road property was operated by Richard Alkes as a scrap yard and hazardous substance disposal facility.

11. As discussed below, hazardous substances have been disposed and released at the Site. The Site is a "facility" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

12. As discussed below, Operable Unit 1 (OU1) for the Site was the initial response action taken by DEC in 1979 to reduce PCB exposure pathways, by creating a PCB containment cell on the 51 Luzerne Road property to hold PCB contaminated materials and soils until a viable technology could be attained. OU2 consists of the PCB containment cell and the contaminated soils on the rest of the Site. OU3 is the PCB groundwater plume from the Site monitored by DEC.

## GE PRODUCTION AND USE OF HAZARDOUS SUBSTANCES

13. GE manufactured electric capacitors at its Fort Edward facility from 1947 to 1975 and at its Hudson Falls facility from 1951 until 1975 (the Facilities).

14. In its capacitor manufacturing process, GE filled capacitors with polychlorinated biphenyls (PCBs) and other hazardous substances. GE purchased the PCBs used in its capacitors from Monsanto Company, which manufactured and sold PCBs under the trade-name "Aroclor." GE filled capacitors with Aroclor 1242 and Aroclor 1254, two PCBs found in soil and groundwater at the Site.

15. GE used PCBs as a fire-resistant dielectric fluid in the capacitors.

16. During the years 1952 to 1975, GE scrapped certain capacitors containing PCBs and other hazardous substances that either failed the testing following manufacture or that were returned from the field by GE customers.

17. GE did not re-use these "scrap" capacitors in the manufacturing process and considered them waste.

18. The PCBs contained within GE's scrap capacitors could not be re-used by GE in the manufacturing of its capacitors.

## GE'S ARRANGEMENT FOR THE DISPOSAL OF CAPACITORS CONTAINING HAZARDOUS SUBSTANCES

19. In June 1956, Site owner/operator Richard Alkes filed a Certificate of Conducting Business Under an Assumed Name or Partnership in New York under the name Adirondack Waste Company (collectively Alkes) and began operating the Site as a scrap yard and hazardous waste disposal facility.

20. Upon information and belief, GE contracted with and/or otherwise requested that Alkes remove scrap capacitors containing PCBs and other hazardous materials from the GE Fort Edward and Hudson Falls Facilities and to dispose of them at the Site. GE thereafter transferred the scrap capacitors to Alkes, who disposed of them at the Site. On information and belief, GE intended that Alkes dispose of the scrap capacitors containing PCBs.

21. The PCB-contaminated scrap capacitors that GE transferred to Alkes were no longer useful products and constituted "waste" within the meaning of Section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903.

22. Upon information and belief, for a three-year period during the 1950s, Alkes had exclusive rights to remove all scrap capacitors from the GE Fort Edward and Hudson Falls Facilities. During at least that period of time, Alkes transported GE capacitors from the Facilities to the Site.

23. In May 1980, GE advised DEC that during the period 1952 – 1965 Alkes disposed of approximately fifty (50) percent of the PCB-contaminated scrap capacitors from the Facilities and that these capacitors contained approximately 210 tons of PCBs. (The May 13, 1980 letter from GE to DEC is attached as Exhibit 1.)

24. During the 1950s and 1960s, Alkes disposed of more than 200 tons of PCB waste and other hazardous substances at the Site.

25. Alkes cut apart GE scrap capacitors containing PCBs and other hazardous substances at the Site to salvage metals. During that process, Alkes allowed the PCBs and other hazardous substances in the GE scrap capacitors to be released directly onto the soil at the Site. Non-salvageable portions of GE scrap capacitors, including capacitor paper impregnated with PCBs and other hazardous substances, were disposed of at the Site in shallow pits.

26. Because GE arranged for the disposal of scrap capacitors at the Site, GE's PCBs and other hazardous substances have entered the environment and have migrated through soil and into groundwater.

27. Since at least January 1972, Monsanto advised GE that PCBs are not readily biodegradable and are contaminants harmful to animal and marine life. Monsanto expressly warned GE that it must take every precaution to prevent any entry of PCBs into the environment. (The January 1972 letter from Monsanto to GE is attached as Exhibit 2.)

28. Upon information and belief, GE knowingly and recklessly failed to

properly dispose of its scrap capacitors containing PCBs and, further, failed to warn Alkes of those PCB hazards. Specifically, GE failed to provide Alkes with safe handling and proper disposal procedures regarding GE's scrap capacitors containing PCBs and other hazardous substances.

29. Accordingly, GE by contract, agreement or otherwise, arranged for the disposal of PCBs and other hazardous substances to the environment at the Site within the meaning of CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

## DOH'S DECLARATION OF A PUBLIC HEALTH EMERGENCY

30. In June 1979, residents in the vicinity of the Site contacted DEC and reported that strong odors were emanating from the Site. The residents expressed concern regarding the odors associated with suspected PCB contaminated waste disposed there.

31. In June and July 1979, DEC performed inspections of the Site and the surrounding area. At that time, DEC Staff acknowledged strong PCB odors and saw hundreds of GE scrap capacitors disposed at the Site, many of which had identifying labels indicating that they were GE's capacitors.

32. During July 1979 Site inspections, DEC took samples of soil, as well as indoor and outdoor air samples at the Site and in the surrounding area. These samples confirmed that nearby residents were being exposed to high levels of PCBs and other hazardous substances.

33. In August 1979, the New York State Department of Health (DOH), issued a Declaration of Conditions Dangerous to Life and Health pursuant to

Public Health Law § 1389-b for the Site. DOH's Declaration found that conditions at the Site constituted a clear and present danger to life and health to those living or working nearby because of PCBs. (The DOH Declaration is attached as Exhibit 3.)

## DEC EMERGENCY REMOVAL ACTION

34. As a result of DOH's issuance of the Declaration, in September 1979, DEC, DOH, the City of Glens Falls (the City), the County of Warren (the County) and the Town of Queensbury (the Town) entered into a Memorandum of Agreement (MOA) to address the human health threat posed by PCB contamination at the Site. The MOA was for the express purpose of addressing dangerous conditions to human health from the PCB wastes at the Site and specifically to area residents. (The Memorandum of Agreement is attached as Exhibit 4.)

35. The MOA provided that Warren County and DEC would construct an interim emergency containment cell, would excavate PCB and other wastes at the Site and in other nearby locations, would place the wastes in the containment cell, would cap and seal the containment cell, and would monitor and maintain it. The MOA expressly provided that implementation of the interim emergency measures would be completed within thirty days.

36. In October 1979, EPA approved the PCB containment cell as an emergency disposal site for PCBs. EPA's approval expressly concurred with DEC's position that the PCB containment cell was an interim emergency measure and

was not considered to be a permanent disposal area for PCB contaminated soils. (The October 23, 1979 EPA approval letter is attached as Exhibit 5.)

37. The 1979 removal of PCBs and other hazardous substances and placement in the interim containment cell was a "removal action" within the meaning of CERCLA Section 101(23), 42 U.S.C. § 9601(23).

38. During October 1979, the County, the City and the Town, under DEC's oversight began excavating wastes and contaminated soils from the Site and from several other local properties where GE scrap capacitors had been disposed and placed such wastes in the PCB containment cell. The PCB containment cell at the Site is known as Operable Unit 1 (OU1).

39. DEC observed groundwater contamination at the Site during construction of the containment cell in 1979.

40. Approximately 13,000 cubic yards of waste was excavated and placed in the PCB containment cell. In the Spring of 1980, a final clay cap was placed over the containment cell. Several groundwater monitoring wells and a leachate collection system were also installed around the PCB containment cell.

41. DEC developed and implemented a monitoring and maintenance plan for the PCB containment cell that included sampling of the groundwater wells and a leachate detection and collector system.

42. The PCB containment cell construction under the MOA did not address long- term remedial requirements at the Site, including residual soil and groundwater contamination.

43. The 1979 removal of PCBs and other hazardous substances and placement in the interim containment cell was a "removal action" within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22).

44. In September 1980, GE provided DEC with $320,000 to reimburse it for costs associated with the PCB containment cell. DEC did not release or otherwise compromise any claims against GE in exchange for the payment. This action does not seek these costs.

45. In December 1980, Congress passed CERCLA and created a comprehensive liability scheme to address the release of hazardous substances to the environment and the recovery of State and federal response costs related to the release.

46. During the period 1980-1985, GE periodically removed PCB-contaminated leachate from the containment cell and transported the leachate to its treatment facility at the GE Fort Edward facility. GE ultimately discharged the treated leachate waste from the contaminant cell into the Hudson River.

47. In May 1985, GE stopped removing, transporting and treating leachate from the PCB containment cell.

48. In 1985 or 1986, an additional synthetic cap was placed over the Site to form a further barrier to infiltration of precipitation and to eliminate any further buildup of leachate in the containment cell's leachate collection system.

49. In August 1986, the State acquired the portion of the Site including the containment cell.

50. In 1987, DEC listed the Site on the New York Registry of Inactive Hazardous Waste Disposal Sites pursuant to Environmental Conservation Law § 27-1305 and classified it as a Class 2 site, which by definition presents a significant threat to the public health or the environment and for what remedial action is required.

51. In March 1991, DEC advised EPA that it was pursuing GE to implement a permanent remedy at the Site. DEC continued to pursue implementation of a permanent remedy at the Site by GE.

Failure of The Containment Cell

52. In April 1995, DEC discovered that the containment cell was leaking.

53. In June 1995, DEC advised GE that it had been identified as potentially responsible for the disposal of PCBs and other hazardous substances at the Site and provided it with the opportunity to undertake an additional removal action at the containment cell by pumping out PCB-contaminated groundwater and properly disposing of it. DEC stated that if GE failed to undertake such measures, the State intended to hire a contractor to perform the work. DEC further advised that, should GE decide not to undertake the work, the State may seek to recover the costs from GE. (The June 22, 1995 letter from Paul Van Cott to John G. Haggard is attached as Exhibit 6.)

54. GE declined to remediate the Site.

55. In February 1996, DEC provided GE with a proposed order on consent setting forth an Interim Remedial Measure (IRM) program for pumping the PCB

contaminated leachate from the PCB containment cell. Additionally, DEC requested that GE coordinate such pumping and removal from the containment cell with groundwater monitoring over a broader area and implement a complete remedial investigation and feasibility study for the Site. (The February 12, 1996 letter from Glen R. Bailey to Michael S. Elder is attached as Exhibit 7.)

56. GE again declined to agree to perform the work DEC proposed.

57. In May 1996, GE declined to participate in settlement discussions and asserted that any remedial activities relating to releases of PCBs from the Site should be the sole responsibility of the State. (The May 21, 1996 letter from Michael S. Elder to Glen R. Bailey is attached as Exhibit 8.)

DEC Conducts a Remedial Investigation/Feasibility Study at the Site

58. Between 1999 and 2001, DEC conducted a remedial investigation (RI) at the Site to determine the nature and extent of contamination. In August, 2002, DEC issued an RI Report confirming that the Site had extensive soil and groundwater contamination.

59. In May 2004, DEC issued a report evaluating various remedial alternatives for the Site known as a Feasibility Study (FS) Report. The FS considered remediation of soils and groundwater and the removal of buried GE capacitors at the Site.

DEC's Remedial Record of Decision

60. Based on the results of the RI/FS at the Site and the criteria identified for evaluation of remedial alternatives at hazardous waste sites set forth in DEC's

regulations, 6 NYCRR Part 375, in March 2005 DEC issued a Record of Decision (ROD). In the ROD, DEC concluded in that the primary contaminants of concern at the Site were PCBs and volatile organic compounds (VOCs) due to the dismantling of GE capacitors and the discharge and release of PCBs to the ground. (The ROD is attached as Exhibit 9.)

61. The ROD found that Alkes' salvaging and disposal of GE capacitors had resulted in the disposal of PCBs and other hazardous substances at the Site, that these wastes had contaminated the soil and groundwater at the Site, and that the contamination constituted a significant threat to human health and the environment.

62. The ROD established the required remedial action at the Site for contaminated soils and groundwater. The selected remedy for soils at the Site consisted of excavation and on-site treatment with a thermal desorption system for contaminated soils (OU2). The selected remedy for groundwater at the Site consisted of long-term monitoring of the on-site groundwater, along with institutional controls, such as environmental easements, to minimize future potential human exposure to the groundwater without treatment (OU3). The ROD estimated that the total cost of the recommended soil and groundwater remedies for the Site was $22.2 million.

63. In September 2007, DEC completed the remedial design and specifications. DEC requested bids for the project in December 2007, but only one bid was received and it significantly exceeded the cost estimate in the ROD. Due to

the high cost of the bid and the lack of sufficient competition, DEC determined that the remedy selected in the ROD was not feasible or cost effective.

64. In February 2008, DEC issued an Explanation of Significant Differences describing a proposed change in the ROD's selected Site remedy. DEC selected a more cost effective remedy, which provided that waste containing PCBs greater than 50 ppm would be excavated and disposed off-site in a permitted landfill, and soils with PCB contamination at or below 50 ppm would be treated on-site using low temperature thermal desorption (as identified in the originally selected remedy).

65. On June 23, 2008, DEC issued a notice to proceed to implement the remedy to its contractors using the State Superfund.

DEC's Response Costs

66. DEC has incurred costs associated with GE's disposal of PCBs and other hazardous substances at the site. These response costs are estimated to be $30,568,240.

FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT

67. Plaintiffs repeat and reallege the paragraphs above.

68. The Site is a facility within the meaning of CERCLA Sections 101(9) and 107(a)(1), 42 U.S.C. §§ 9601(9) and 9607(a)(1).

69. GE is a person within the meaning of CERCLA Sections 101(21) and 107(a), 42 U.S.C. §§ 9601(21) and 9607(a).

70. GE by contract, agreement or otherwise arranged for the disposal or arranged for the disposal and consequent release of PCBs, VOCs and other hazardous substances at the Site within the meaning of CERCLA Section 107(a), 42 USC § 9607(a).

71. PCBs and VOCs are hazardous substances within the meaning of CERCLA Sections 101(14) and 107(a), 42 U.S.C. § 9601(14) and 9607(a).

72. By contract and agreement with a third party, GE caused and contributed to the releases of hazardous substances to the environment.

73. The release of PCBs, VOCs and other hazardous substances at and from the Site has caused contamination of the environment of the State, including, but not limited to, soils, groundwater and air, within the meaning of CERCLA Sections 101(22) and 107(a), 42 U.S.C. §§ 9601(22) and 9607(a).

74. The release of hazardous substances to the environment at and from the Site has caused the State to incur response costs not inconsistent with the National Contingency Plan within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25).

75. GE is within the class of persons responsible for the release of hazardous substances to the environment as a person who by contract, agreement, or otherwise arranged for disposal or treatment, and/or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by GE at a facility owned by a third party within the meaning of CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

76. GE is strictly, jointly and severally liable for the State's past response costs incurred in responding to releases of hazardous substances to the environment at the Site pursuant to CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

77. GE is strictly, jointly and severally liable for the State's past response costs pursuant to CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

78. None of the enumerated defenses to liability are applicable to GE's liability for arranging the disposal of hazardous substances at a facility.

79. CERCLA Section 113 and the Declaratory Judgment Act Sections 2201 and 2202 authorize the Court to enter a declaratory judgment finding GE liable for arranging for the disposal of hazardous substances at the Site and to order such other relief deemed proper.

SECOND CLAIM FOR RELIEF – CERCLA § 107(a)(3) COST RECOVERY

80. Plaintiffs repeat and reallege the paragraphs above.

81. GE arranged for disposal of scrap capacitors containing PCBs, VOCs and other hazardous substances, which were released to the environment and which caused the State to incur response costs at the Site. GE is a covered person within the meaning of CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3). Accordingly, GE is strictly, jointly and severally liable for the State's response costs incurred in responding to releases of hazardous substances at the Site not inconsistent with the NCP pursuant to CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

82. The State is entitled to recovery of its response costs in the amount of $30,568,240.

### THIRD CLAIM FOR RELIEF – RESTITUTION/UNJUST ENRICHMENT

83. Plaintiffs repeat and reallege the paragraphs above.

84. The hazardous substance contamination of soil, groundwater and air at and near the Site poses a significant threat to public health, safety and the environment, and has interfered with the rights common to all members of the public, including the right to clean soil, groundwater and air. As such, the hazardous substance contamination at and near the Site constitutes a public nuisance.

85. GE knew or should have known of the hazardous substances contamination at and near the Site, and knew or should have known of the threat to public health, safety and the environment posed if not abated and remediated.

86. GE had and continues to have a duty to the State and the public to investigate, abate, and remediate the hazardous substances released to the environment. GE's duty includes the obligation to conduct necessary environmental studies to determine the nature and extent of contamination, to abate, remediate and eliminate the release and/or the threatened release of hazardous substances, and to monitor the Site and impacted off-Site areas to ensure that abatement and remedial measures are adequate to protect the public health and the environment.

87. GE has failed and refused to perform its duty to the State and the public to investigate, abate and remediate the hazardous substances released to the environment.

88. As a result of GE's failure and refusal to perform its duties, the State has performed, and will in the future perform, the duty owed by GE to investigate, abate and remediate hazardous substance contamination at and near the Site.

89. The actions taken and the costs incurred by the State investigating, abating, and remediating were immediately necessary and continue to be necessary to and protect the health, safety and welfare of the public and the environment.

90. GE has been and will continue to be unjustly enriched by the State's performance of the duties it owes to the public and the State.

91. To the extent not awarded to the State on its claims for cost recovery pursuant to CERCLA, GE is liable to the State for the payment of costs and expenses incurred in addressing the hazardous substance contamination at and near the Site, including, but not limited to, all costs of investigation, remediation, oversight, operation, maintenance and management.

PRAYER FOR RELIEF

WHEREFORE, the State prays for a judgment:

(a) On the First Claim for Relief, declaring that GE is responsible for the State's response costs incurred at the Site not inconsistent with the National Contingency Plan;

(b) On the Second Claim for Relief, finding GE liable and awarding judgment against GE for the State's response costs incurred not inconsistent with the National Contingency Plan, in the amount of $30,568,240;

(c) On the Third Claim for Relief, to the extent not awarded to the State on its claims for cost recovery pursuant to CERCLA Section 107(a), declaring GE is responsible for all costs and expenses incurred by the State at the Site, and awarding the State such costs including, but not limited to, all costs of investigation, remediation, oversight, operation, maintenance and management at the Site; and

(d) Awarding to plaintiffs reasonable attorneys' fees, costs and expenses, and pre-judgment interest, as allowed by law, together with such other and further relief as the Court deems just and proper.

Dated: Albany, New York
       June 19, 2014

>ERIC T. SCHNEIDERMAN
>Attorney General of the
>  State of New York
>
>By:
>
>s/ Joseph M. Kowalczyk
>LISA M. BURIANEK
>MAUREEN F. LEARY
>JOSEPH M. KOWALCZYK
>Assistant Attorney General
>Bar Number: 515732
>Attorney for Plaintiffs
>Environmental Protection Bureau

19

                The Capitol
                Albany, New York 12224
                Tel: (518) 474-8480
                Fax: (518) 473-2534
                E-mail: Joseph.Kowalczyk@ag.ny.gov