**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

STATE OF NEW YORK, THE NEW
YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and JOSEPH MARTENS, as
Commissioner of the New York              No. 1:14-CV-747
State Department of Environmental         (CFH)
Conservation,

                              Plaintiffs,

            v.

GENERAL ELECTRIC COMPANY,

                              Defendant.

_____

**APPEARANCES:**                    **OF COUNSEL:**

New York State Attorney General     JOSEPH M. KOWALCZYK, ESQ.
The Capitol                         MAUREEN F. LEARY, ESQ.
Albany, New York 12224
Attorneys for Plaintiffs

New York State Department of Law    LISA M. BURIANEK, ESQ.
The Capitol
Albany, New York 12224
Attorneys for Plaintiffs

Greenberg, Traurig Law Firm         ROBERT M. ROSENTHAL, ESQ.
Albany Office                       WILLIAM A. HURST, ESQ.
54 State Street, 6th Floor          STEVEN C. RUSSO, ESQ.
Albany, New York 12207
Attorneys for Defendant

Greenberg, Traurig Law Firm         STEVEN C. RUSSO, ESQ.
200 Park Avenue
Met Life Building
New York, New York 10166
Attorneys For Defendant

**CHRISTIAN F. HUMMEL,**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

In this action[1] by plaintiffs the State of New York, the New York State Department

of Environmental Conservation ("DEC"), and Joseph Martens, as Commissioner of the

New York State Department of Environmental Conservation

(collectively, where appropriate, "the State") pursuant to Comprehensive Environmental

Remediation, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.

to recover costs incurred responding to the release of hazardous substances at 51 and

53 Luzerne Road, Queensbury, New York.[2]  Presently pending is defendant General

Electric Company's ("GE") motion for summary judgment seeking to dismiss the

complaint in its entirety, Dkt. No. 46, and the State's competing motion for partial

summary judgment as to liability, Dkt. No. 47.  Both parties have opposed their

opponents' motions.[3]  Dkt. Nos. 48, 49.  Both parties have filed replies.  Dkt. Nos. 56,

58.  The State filed a counter-statement of facts and statement of additional facts in

---

[1]  The parties have consented, pursuant to 28 U.S.C. § 636(c), to the assignment of this case to the undersigned for all proceedings in this action, including the entry of final judgment.  See Dkt. No. 22.

[2]  In the complaint, the State seeks (1) a "declaratory judgment finding GE liable for arranging for the disposal of hazardous substances at the Site and to order such other relief deemed proper" under CERLCA § 113 and the Declaratory Judgment Act §§ 2201, 2202; (2) recovery of $30,568, 240 in expenses, pursuant to CERCLA § 107(a)(3); (3) "to the extent not awarded to the State on its claims for cost recovery pursuant to CERCLA, . . . payment of costs and expenses incurred in addressing the hazardous substance contamination at and near the site, including, but not limited to, all costs of investigation, remediation, oversight, operation, maintenance and management" pursuant to the common law theories of unjust enrichment and restitution, and (4) reasonable attorneys' fees, costs and expenses, and prejudgment interest.  See Dkt. No. 1 ("Compl").

[3]  The State designates its opposition papers as "in opposition to defendant's motion for partial summary judgment."  Dkt. No. 49 at 7.  However, from the Court's review of GE's papers, GE seeks summary judgment on the entirety of the complaint.  See Dkt. No. 46.

response to GE's motion for summary judgment.  Dkt. No. 49.  GE filed objections to both the State's statement of material facts in support of the State's motion for partial summary judgment and its counter-statement of facts/statement of additional facts.  Dkt. Nos. 48-1, 57.  For the reasons that follow, GE's motion for summary judgment is granted in part and denied in part, and the State's motion for partial summary judgment is denied.

## I.  BACKGROUND[4]

The State commenced this action seeking recovery of costs under pursuant to CERCLA, 42 U.S.C. §§ 9601 et seq. and State common law for the alleged release of polychlorinated biphenyl ("PCB") which contaminated property at 53 Luzerne Road. See generally Compl.  The State contends that, from 1952 to 1965, GE arranged for the disposal of scrap capacitors with Richard Alkes, the former owner of 53 Luzerne Road, who owned a scrap yard on the rear portion of the property.[5] Compl. at 3.  In June 1979, the State became aware that there was PCB contamination at 53 Luzerne Road.  In August 1979, the Department of Health ("DOH") listed six residential properties in Queensbury as hazardous to human health – the 53 Luzerne Road property was not listed among these properties.  Dkt. No. 49-1 at 6, 21.

---

[4]  As familiarity with the facts underlying this motion is assumed, this summary of facts is not meant to be exhaustive.  The facts that are set forth in this section are those the Court deemed helpful in understanding the issues presented.  For a more detailed recitation, reference is made to the complaint and to the parties' statements of material fact, counter-statements of fact, and objections.  Dkt. Nos. 1 ("Compl."), 46-1, 47-1, 48-1, 49-1, 57.

[5]  Alkes used rear portion of 53 Luzerne Road as a scrap yard from 1951 to 1976.  Dkt. No. 49-1 at 2.

In October 1979, following approval by the Environmental Protection Agency ("EPA"), the State, pursuant to an agreement with the DOH, City of Glens Falls, Warren County, and the Town of Queensbury, excavated materials amounting to approximately 13,000 cubic yards of waste from the rear portion of 53 Luzerne Road – the portion that contained the Alkes scrap yard – along with six residential properties. Dkt. No. 49-1 at 15. The State constructed a containment cell,[6] referred to as the West Glens Falls PCB Facility, on 51 Luzerne Road,[7] a nearby land parcel, and deposited capacitors[8] and contaminated soil from 53 Luzerne Road and six nearby residential properties into the cell. Dkt. No. 47-9 at 12. The containment cell reached capacity before all of the PCB contaminated waste could be added; thus, the State was unable to remove all contaminated soils from 53 Luzerne. Dkt. No. 48-1 at 10. In 1981, the State, in agreement with Warren County, installed an "organic cap" over the portion of 53 Luzerne Road that was the location of the former Akles scrap yard because PCBs that remained were "volatilizing from this area at an unacceptable rate." Dkt. No. 46-3 at 297-98.

In 1980, the State released its first list of hazardous waste sites, "Hazardous

---

[6] The parties dispute the appropriate name of the cell constructed to contain PCB waste. GE refers to it as the "PCB Landfill," where as the State refers to it either as a "PCB Containment Cell" or "the Site," which under the State's definition encompasses the properties at both 51 and 53 Luzerne Road. See generally Dkt. Nos. 46, 47. For the sake of clarity and consistency, the Court will refer to the specific measures undertaken in 1979 to deposit hazardous waste from 53 Luzerne Road and residential properties into a facility at 51 Luzerne Road as the "containment cell."

[7] GE acquired 51 Luzerne Road from the City of Glens Falls in 1986. Dkt. No. 49-1 at 2.

[8] The waste deposited in the cell included PCB contaminated soil, "intact capacitors, empty capacitor cases, foil-backed paper." Dkt. No. 47-9 at 12.

Waste Disposal Sites in New York State – First Annual Report," pursuant to the Inactive Hazardous Waste Disposal Site Act (L.1979, ch. 282), Environmental Conservation Law Article 27, Title 13 ("Act"), which required the State to "transmit a report to the Legislature and the Governor identifying every inactive hazardous waste disposal site." Dkt. No. 49-1 at 21-22.[9]  The Act also required the State to maintain required DEC to "maintain and make available the Registry – a document that has been available for public review since 1980 – for public inspection at each of its regional offices and sub offices." Id. at 22.  In the First Annual Report, the containment cell was listed under classification code "E."  Id. at 23-24.  Sites listed under classification code E were defined as "remedial work is completed," "the need for scheduled surveillance and chemical analysis for a properly closed or maintained site."  Id.  The Act was amended in 1982, requiring the State to classify all hazardous waste sites in the Registry pursuant to a classification system it set out.[10]  Dkt. No. 49-1 at 26-27.  In 1983, DEC listed the containment cell in its Annual Report as "Classification 4," which meant that the site was closed, but monitoring was needed.  Dkt. No. 49-1 at 26.  DE listed the containment cell under "Classification 4" from 1983 to 1990.  Id. at 30.

In the fall of 1980, GE paid $320,000 to the State to contribute toward the cost of

---

[9]  The Act required the DEC to transmit a report to the State Legislature and Governor identifying all inactive hazardous waste disposal sites on or before May 15, 1980 and annually.  The Act also required the DEC to maintain and make available for public inspection a registry of inactive hazardous waste disposal sites.

[10]  The Legislature amended the Act in 1982, requiring DEC to classify all hazardous waste sites into five different categories.  Classification 4 was defined as "site properly closed - requires continued management."  L. 1982, c. 857, § 4.  This classification system replaced DEC's method of classification of sites used in its First Annual Report, classifying sites as N, A, B, C, D, E, or F.  Dkt. No. 49-1 at 26-27.

the cleanup of 53 Luzerne Road.   Dkt. No. 49-1 at 24.  In Spring 1980, a clay cap was installed on the containment cell.  Id. at 14.   GE pumped and treated the leachate in the containment cell from the containment cell from 1980 to 1985.  Id. at 17.  In 1985 or 1986, the State updated the existing clay cap of the containment cell to a poly vinyl chloride liner with a twenty-year life expectancy.  Id. at 12.  In 1986, the State became the record owner of 51 Luzerne Road.  Id. at 18.  Also in 1986, the State listed 53 Luzerne Road in the Registry of Inactive Hazardous Waste Disposal Sites ("Registry") for the first time.[11]  Dkt. No. 49-1 at 21.  In 1987, the State listed the rear portion of 53 Luzerne Road as the "Luzerne Road Site" in the Annual Report, with AMG Industries as the owner.  Id. at 37.  In March or April of 1990, the "Luzerne Road Site" was "delisted" from the Registry, and merged as an "operable unit" of the Luzerne Road site.[12]  Dkt. No. 49-1 at 37.  From 1991 to 2000, the annual reported referred to the "Luzerne Road Site" as a "remedial action" that had been "completed[,]" that "[a]dditional investigation is needed[,]" and that "[g]roundwater contamination" is possible."  Dkt. No. 46-4 at 4-5.

In 1991, the State sought to change the acceptable leachate elevation level in the containment cell from two to ten feet.  Dkt. No. 49-1 at 42.  Between August 1989 and March 1991, the leachate level dropped from 10.6 feet to 9.2 feet.  Dkt. No. 49-1 at 43.  In March 1995, the leachate level of the containment cell was measured to be 7.2 feet.  Id. at 44.  In June 1995, the State informed the EPA that the containment cell was

---

[11]  The Inactive Hazardous Waste Disposal Site Act required the DEC on or before May 15, 1990, and annually thereafter, to transmit a report to the Legislature and Governor identifying all inactive hazardous waste disposal sites.  Dkt. No. 49-1 at 21.

[12]  From December 1987 to April 1990, DEC listed the containment cell and the rear portion of 53 Luzerne Road ("the Luzerne Road Site') as separate sites in the Registry.  Dkt. No. 49-1 at 37.

leaking.  Id.  Also in June 1995, the State sent GE a letter informing GE that the State

was pumping PCB-contaminated ground water from the containment cell and identifying

GE as a party potentially responsible for the contamination.  Id. at 44-45.  In February

1996, GE informed the State that the containment cell was the State's responsibility,

and not GE's.  Id. at 46.  In the 1996,[13] the State changed the description of the

containment cell listed in the Registry.[14]

        In 2002, the State issued a Remedial Investigation Report/Feasibility Study

("RI/FS") of the containment cell.  Rosenthal Dec. Exh. 48 at 1.  The RI/FS

characterized the containment cell as "a cell to temporarily store the PCB-containing

soils."  Dkt. No. 49-1 at 49 (citing Rosenthal Dec. Exh. 49 at 2).  In December 2004, the

State issued a Proposed Remedial Action Plan ("PRAP") which divided the clean up

---

[13]  April 1995 Registry:

> The site is adjacent to the Glens Falls Landfill site, and consists of the
> rear portion of a parcel identified as 53 Luzerne Road, and the former
> West Gelsn Falls PCB Disposal Site, (site No. 557001).  The rear portion
> of 53 Luzerne Road is a former junk yard where capacitors containing
> PCBs were scrapped and buried.  The capacitors and some
> contaminated soil (13,000 cubic yards) were removed from the site in
> 1979 and secured in the designed PCB Disposal cell.

Dkt. No. 49-1 at 47 (citing Rosenthal Dec. Exh. 47).

[14]  The 1995 and 2000 Registry reports:

> The site is adjacent to the Glens Falls Landfill Site ID No. 557003, and is
> defined as the area to the rear of a parcel identified as 53 Luzerne Road.
> This area of the 53 Luzerne Road property was used as a junk yard in the
> past where capacitors containing PCBs were scrapped and buried.  This
> former junk yard covered approximately 300 square feet in area.  Some
> of the discarded capacitors and approximately 13,000 cubic yards of
> contaminated soil were removed from the site in 1979 and secured in a
> designed PCB disposal cell adjacent to the site.

Dkt. No. 49-1 at 47 (citing Rosenthal Dec. Exh. 47).

actions into three operable units – operable unit 1 ("OU1"), the initial excavation of 53

Luzerne Road, the Alkes Site, in 1979; operable unit 2 ("OU2"), the containment cell on

the rear portion of 51 Luzerne Road and the "surface souls on the rest of the 51

Luzerne Road property, and the back lot of the 53 Luzerne Road property"; and

operable unit 3 ("OU3"), the subject of the PARP and PCB groundwater plume.  Dkt.

No. 49-1 at 50.  The PARP proposed a remedy for OU2, and listed various alternatives

for soil and groundwater treatment.  Id.  The PARP recommended soil alternative 4,

which it defined as "consist[ing] pf excavation and thermally treating contaminated soils

that exceed the remedial action objective for PCBs of 1 ppm in the surface soils and 10

ppm in the subsurface soils."  Id.

In March 2005, the State issued a record of decision ("ROD"), selecting soil

alternative four – which allowed for off-site treatment, and groundwater alternative 2.

Dkt. No. 49-1 at 51 (citing Rosenthal Decl. Exh. 52 at 19).  The ROD estimated the total

cost of the selected remedy to be $22.255 million.  Dkt. No. 49-1 at 51-52.  In December

2007, the State rejected the sole bid it received for the option selected in the ROD.  Dkt.

No. 49-1 at 54.  In February 2008, the State issued an Explanation of Significant

Differences ("ESD"), choosing a treatment option different from that set forth in the ROD

– excavation and off-side disposal of waste containing PCBs higher than 50 ppm in an

approved landfill.  Dkt. No. 49-1 at 54.  The ROD did not mention any off-site treatment

or disposal.  Id.  The combined cost of the implemented remedy was approximately

$27.81 million.  Dkt. No. 49-1 at 56 (citing Scott Decl. ¶¶ 25-27).

The State seeks a "[r]uling that the State has met its prima facie burden of

proving that GE is jointly and severally liable under CERCLA § 108(a) for certain response costs incurred by the State in responding to contamination at and emanating from the Site" and "such other and further relief as the Court deems just and proper." Dkt. No. 47-9 at 25.  GE seeks summary judgment "on the claims in the Complaint." Dkt. No. 46-8 at 53.

## II.  LEGAL STANDARDS

### A.  Motion for Summary Judgment

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56 (a).  The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  For a court to grant a motion for summary

judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party.  Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

## B.  CERCLA Standards

Under 42 U.S.C. §§ 9601, et seq., "'CERCLA's primary purposes are axiomatic: (1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition.'"  ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (quoting Price Trucking Corp. v. Norampac Indus., 748 F.3d 75, 79 (2d Cir. 2014)).  CERCLA imposes "strict liability on facility owners and operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site, often collectively referred to as potentially responsible parties.  Id. at 198 (citing 42 U.S.C. § 9607(a)(1)-(4) (additional citation omitted)).[15]

---

[15]  Under section 9607(a)(1)-(4), the following may be considered responsible parties:

> (1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(1)-(4).

"Response costs can be recovered if '(1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) . . . the defendant generated hazardous waste at the clean-up site.'" Niagara Mohawk Power Corp. v. Consol. Rail Corp., 291 F. Supp. 2d 105, 119 (N.D.N.Y. 2003), aff'd in part and rev'd in part on other grounds 596 F.3d 112 (2d Cir. 2010); United States v. Alcan Aluminum Corp., 315 F.3d 179, 184 (2d Cir. 2003).

As the Second Circuit has indicated,

> [a]t the summary judgment stage . . . the analysis of a 'genuine dispute of material fact' in the context of a 113 claim under CERCLA might seem limited and constrained.  The party seeking contribution must, of course, establish that the defendants qualify as PRPs [potentially responsible parties] under the statute and must demonstrate that it is probable that defendants discharged hazardous material. But the party seeking contribution need not establish the precise amount of hazardous material discharged or prove with certainty that a PRP defendant discharged the hazardous material to get their CERCLA claims past the summary judgment stage. By referencing 'equitable factors,' the statute requires district courts to consider the practical difficulties in these cases. Summary judgment is only proper when a defendant establishes it is not liable at all under CERCLA – namely, it is not a PRP under the statute, there is no plausible evidence that it discharged hazardous materials, or it is eligible for one of the three affirmative defenses available under  § 107.

Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 132 (2d Cir. 2010) (citing 42 U.S.C. § 9607(b)).  Addressing summary judgment in CERCLA cases, the Second Circuit

> [has] recognized in CERCLA's context that summary judgment is a 'powerful legal tool[ ]' that can 'avoid lengthy and perhaps needless litigation.'  This tool is one well adapted to encouraging settlement and speeding remediation.  Its utility in CERCLA litigation is not a license to

11

> use it when material facts are genuinely disputed.  Just as
> there is no heightened pleading standard in CERCLA cases,
> the showing required to survive summary judgment also
> remains the same.

B.F. Goodrich v. Betkoski, 99 F.3d 505, 521 (2d Cir. 1996), decision clarified on denial

of reh'g, 112 F.3d 88 (2d Cir. 1997) (internal citations omitted).  Further, courts

"construe CERCLA liberally to advance its 'dual goals of cleaning up hazardous waste

and holding polluters responsible for their actions.'" N.Y. State Elec. & Gas Corp. v.

FirstEnergy Corp., 766 F.3d 212, 220 (2d Cir. 2014) (quoting New York v. Next

Millenium Realty, LLC,[16] 732 F.3d 117, 124 (2d Cir. 2013)).   A "CERCLA plaintiff is not

required to prove its case with scientific certainty; a preponderance of the evidence is

enough." B.F. Goodrich, 99 F.3d at 526.

## C.  Unjust Enrichment Standard

An unjust enrichment cause of action under New York law is subject to a six-year

statute of limitations, which accrues "upon the occurrence of the wrongful act giving rise

to a duty of restitution." Elliot v. Qwest Communications Corp., 25 A.D.4d 897, 898 (3d

Dep't 2006) (citing Congregation Yetev Lev D'Satmar, Inc. v. 26 Adnar N.B. Corp., 192

A.D.2d 501, 503 (2d Dep't 1993).

## III.  DISCUSSION

## A.  Remedial or Removal

---

[16]  Next Millenium Realty, LLC, as spelled here, is reflective of the spelling used by Westlaw.

As all parties acknowledge, a threshold issue that must be determined is whether the State's clean up actions can be characterized as "remedial" or "removal." "Because of this difference in limitations periods, whether an activity is a 'removal action' or a 'remedial action' under § 107(a) can be determinative of the timeliness of a claim." Schaefer v. Town of Victor, 457 F.3d 188, 195-96 (2d Cir. 2006). "[T]o determine which statute of limitations applies, the Court must determine whether the corrective actions were removal or remedial. This is a question of law." MPM Silicones, LLC v. Union Carbide Corp., 11-CV-1542 (BKS/ATB), 2016 WL 3962630, at *11 (N.D.N.Y. July 7, 2016) (citing N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp., 766 F.3d 212, 230 (2d Cir. 2014)).

Remedial actions are

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present of future public health or welfare or the environment.

42 U.S.C. § 9601(24). CERCLA further provides that "remedial" "includes, but is not limited to": (1) "such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover"; (2) "neutralization, cleanup of released hazardous substances and associated contaminated materials"; (3) "dredging or excavations"; (4) "onsite treatment or incineration"; (5) "collection of leachate and runoff"; (6) "any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment"; and (7) "offsite

transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." Id.  To recoup the costs of a remedial action, the party seeking reimbursement must commence an action within six years from the "initiation of physical on-site construction of the remedial action." Id.; see also Schaefer, 457 F.3d at 195.  A remedial action has been defined by courts as a permanent remedy – one that "is supposed to be a final, once-and-for-all cleanup of a site[.]"  New York State Elec. and Gas Corp. v. FirstEnergy Corp., 766 F.3d 212, 236 (2d Cir. 2014).  "[T]here can only be one remedial action at any given site." Id.  The statute of limitations on a remedial action begins to run with the commencement of physical on-site construction that is consistent with a permanent remedy.  Schaefer, 457 F.3d at 207.

By contrast, a removal action is

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threatened release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).  Courts stress the immediacy of the threat in determining whether a cleanup is a removal action.  Next Millenium Realty, LLC, at 125 (citing United States v. W.R. Grace & Co., 429 F.3d 1223, 1344 (9th Cir. 2005)).

CERCLA provides that activities that are consistent with removal actions include: "security fencing or other measures to limit access, provision of alternative water

supplies, [and] temporary evacuation and housing of threatened individuals . . ."  42

U.S.C. § 9601(23).  To recoup costs of a removal action from a responsible party, the

action must be brought within three years "after the completion of the removal action."

Id. § 9613(g)(2).  Removal actions "are generally shorter in duration and lower in cost

than remedial measures."  MPM Silicones, LLC, 2016 WL 3962630, at *12 (quoting

FirstEnergy Corp., 766 F.3d at 230-31).  A response taken pursuant to an emergency is

often defined as a removal action.  Id. at 13 (citing cases).  Similarly, "measures taken

to minimize and mitigate contamination, but not to permanently eliminate it, are properly

classified as removal actions."  N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp., 766

F.3d 212, 233 (2d Cir. 2014).   "Distilled to its core, the key distinction between a

remedial and a removal action is the purpose for which the action is undertaken."  MPM

Silicones, LLC, 2016 WL 3962630, at *11 (quoting Yankee Gas Servs. Co. v. UGI Utils.,

Inc., 616 F.3d 228, 2270 (D. Conn. 2009)).

    The State argues that it undertook a removal action, whereas GE contends the

clean up is a remedial action.  See generally Dkt. Nos. 46, 47.  Under the State's

approach, the 1979 excavation, 1982 capping of 53 Luzerne, and 1984 recapping of the

containment cell were removal actions.  The State argues further that it did not

implement permanent remedy –  the remedial action – until June 23, 2008.  Dkt. No. 47-

9 at 14.  Thus, the statute of limitations expired six years later on June 23, 2014.[17]

Under GE's theory, the statute of limitations was triggered by the capping of the

---

[17]  The State commenced this action on June 19, 2014.  See Compl.  Thus, under the State's
theory, the action is timely.

containment cell in 1982, but the statute of limitations began to run in 1986,[18] making latest possible date for the expiration of the statute of limitations October 1992. Dkt. No. 46-8 at 36, 38. GE argues that the State's cleanup of 53 Luzerne Road in 2008-2009 "constituted a second phase of a remedial action started in 1979-82. Dkt. No. 46-8 at 37-38.

The State argues that the evidence of record supports that the 1979 excavation, creation of the containment cell, natural cap on 53 Luzerne, and various caps on 51 Luzerne were a removal action, as it was taken pursuant to an emergency and was not intended to be a permanent remedy. See generally Dkt. No 49. GE argues that the evidence demonstrates that GE intended the containment cell to be a permanent remedy, as evidenced by (1) documents referring to the site as "remedial," "completed," and "closed"; (2) the fact that the cell was built pursuant to an EPA permit pursuant to the Toxic Substances Control Act of 1976 ("TSCA"); and (3) because the State took no steps toward a permanent solution to remove the PCB waste from the faulty containment cell until 1999. See generally Dkt. No. 46-8. The Court reviews each of these arguments below.

### 1.  Design and Construction of Containment Cell

The State contends that the containment cell is a removal action because it was

---

[18]  When CERCLA was first enacted, it did not have a statute of limitations. "The statute of limitations was created in 1986 when Congress passed The Superfund Amendment and Reauthorization Act ("SARA"), Pub. L. No. 99-499, Oct. 17, 1986, 100 Stat. 1613 (codified at 42 U.S.C. § 9601, et seq." FirstEnergy Corp, 766 F.3d at 231, n.16. All cleanup measures taken prior to SARA's enactment were to accrue the date SARA took effect, October 17, 1986. Id.

built pursuant to an emergency.  Dkt. No. 49 at 9.  The State argues that the evidence

supports that the containment cell was designed and constructed under great urgency

to avoid the release or threat of release of hazardous substances, PCBs, into the

environment.  Id.  The State points out that the containment cell was planned and built

very shortly after it became aware of the PCB contamination, and that many of the

longer-term approaches – such as hiring an engineer to design and an outside

contractor to build, meeting all EPA regulatory requirements, and allowing for off-site

disposal – were rejected as inconsistent with an immediate remedy.  Id. at 9.  The State

highlights, as evidence that a containment cell was not the "ideal" option, a July 1979

letter from DEC's Regional Director and the Assistant Commissioner for Environmental

Quality to Commissioner Flacke, it was noted that EPA's "preferred option" for 53

Luzerne was to "remove all contaminated materials to a secure disposal site."  Dkt. No.

46-3 at 232.

The State points out that, for the first and only time, the containment cell was

designed and constructed by DEC's "in-house staff," rather than bid out to an engineer

and a contractor, and was built by county employees.  Dkt. No. 49 at 11 (citing Dkt. No.

47-3 at 45-46).  Further, the State notes that, although it considered incineration of the

PCB waste – which would have been a permanent solution – it was not a "practical" due

to "the immediacy of the present situation coupled with the minimum lead time required

to set up an operational facility."  Dkt. No. 49-3 at 2.  Further, the State points out that

the approximate cost of the containment cell's construction was $300,000, and the

recapping cost $211,00 – amounts which are suggestive of a removal action, especially

when compared to the cost of the State's final action to clean up the PCB waste – excavation and off-site thermal disposal of the PCB waste, costing approximately $22.5 million.  Dkt. No. 49-1 at 35, 52.

GE disputes the State's hastily-constructed and designed argument, noting that, although the EPA "waived" several of its conditions for "approvable landfills," it still set forth many conditions on the containment cell.  Further, GE refers to several instances wherein the State references having a TSCA permit or TSCA approval.  Dkt. No. 46-8 at 14.


## 2.  Characterization of Containment Cell

In support of its argument that the containment cell was an emergency akin to a removal action, the State points to several documents wherein the State described the PCB contamination at 53 Luzerne as an emergency and an imminent threat to the public and the environment.   Dkt. No. 49 at 9-15.  First, the State directs the Court to an August 30, 1979 Declaration by David Axelrod, M.D., Commissioner of Health for the State, wherein he concluded that "one or more . . . conditions has been found to exist in each of the sites hereinafter set forth and, alone or in combination, constitute a clear and president danger to life and health to those living and working on those sites. "  Dkt. No. 49 at 27-28 (citing Dkt. No. 46-3 at 248).  The State concedes that the Declaration identified certain residential properties contaminated with PCBs, but did not address or at all mention the Alkes scrap yard at 53 Luzerne or the eventual location of the containment cell at 51 Luzerne.  Dkt. No. 49-1 at 7; Dkt. No. 46-3 at 248-51.  As this

Declaration does not address 51 or 53 Luzerne, it cannot be said to support a claim that the containment cell was constructed in response to a release or threatened release at PCBs at 51 Luzerne.

The State notes that, in submitting its plan for the containment cell to the EPA, Norman H. Nosenchuck, then Director of the Division of Solid Waste Management at the DEC, stated in an August 1979 letter to the Deputy Director of the EPA, that "there is an urgent need to proceed with this project as rapidly as possible" and, that he would continue forward with the design and "assume that these concepts are acceptable" unless it heard otherwise.  Dkt. No. 49-1 at 4 (citing Dkt. No. 46-3 at 235).  The State also points to an August 1979 agreement between the State, the County of Warren, the City of Glens Falls, and the Town of Queensbury to create a containment cell, as an "emergency" response to "the serious environmental and health problems that exist because of PCB contamination at several sites in the West Glens Falls, New York area." Dkt. No. 46-3 at 254.

The State next refers to an October 23, 1979 letter from the Richard T. Dewling, Ph.D., Acting Regional Administrator of the EPA, to Robert F. Flacke, Commissioner of the State DEC, approving the creation of the West Glens Falls PCB Disposal Site.  Dkt. No. 46-3 at 263.  The State argues that this letter demonstrates both that an emergency condition existed at 53 Luzerne, spurring the creation of the containment cell, and that the containment cell was intended to be temporary.  Id.  The Dewling letter refers to the containment cell as "an emergency disposal site for polychlorinated biphenyls ('PCBs')." Id.  The letter identifies "serious environmental and health problems that exist because

of PCB contamination at several sites in the West Glens Falls, New York area" and

notes that it is "clear . . .  that swiftly-implemented solutions are necessary to stop PCB

volatilization in the area and to protect local residents."  Id.  The letter acknowledges

that

> [w]hile the Site does not meet all of the requirements of 40
> CFR §716.41(b) for approvable landfills, I have decided that
> the emergency situation in West Glens Falls and my finding
> that the operation of the landfill will not present an
> unreasonable risk of injury to the health or environment from
> PCB's justifies my waiver of certain of the 40 CFR
> §761.41(b) requirements and my approval of the Site.

Id. at 263-64.  Further, Dr. Dewling provides that "[y]our staff has indicated that DEC

does not consider the West Glens Falls PCB Disposal Site to be a permanent disposal

site for PCB-contaminated soils" and states that he "fully agree[s] with this position."  Id.

at 267.  He provided that, "[a]s soon as it becomes feasible to move the PCBs at the

Site to a chemical waste landfill or high temperature incinerator . . . this should be

done."  Id.  Further, Dr. Dewling noted that, "should any major leak develop at the Site,

creating the threat of contamination of the surrounding environment, then excavation of

the contaminated material and transport of the material to another site may be

necessary."  Id.

The State also argues that the creation of the containment cell was a removal,

rather than remedial action, because it did not permanently remedy the PCB

contamination at 53 Luzerne.  Dkt. No. 49 at 29.   The State argues that when it

excavated 53 Luzerne and the other properties, it was unable to remove all of the

contaminated PCB soils from 53 Luzerne due to the capacity of the containment cell.

20

Id.  Thus, PCB-contaminated soil remained at 53 Luzerne.  Id.  Further, the State notes that, in the years after the excavation and construction of the containment cell, it took the steps necessary to "mitigate" the exposure and maintain the cell and the remaining contaminated property at 53 Luzerne.  Id. at 15.  The State installed an "interim organic cap" in 1982 over the portion of 53 Luzerne Road that still contained PCB contaminated soils in order to "mitigate exposure until such time a final remedial action could be implemented."  Dkt. No. 49 at 16 (citing Dkt. No. 47-8 at 63).  The State also notes that it did not take any steps to address groundwater remediation.  Id. at 16.  Thus, the State contends that the various steps it took over the years were not those in a permanent solution, but merely maintaining the temporary solution.  Id. at 15-21.

The State argues that its selection of more temporary and less costly options to construct and maintain the containment cell over the years is further evidence that it was not intended to be a remedial action.  In 1984, when it became clear that the initial clay cap on the containment cell was allowing too much water to permeate, "DEC selected the lowest cost option" to upgrade the cap rather than the more expensive recommended alternative "even though it was inferior to the recommended option."  Dkt. No. 49 at 29 (citing Dkt. No. 47-8 at 63, Burke Decl Exh. 10).  The State argues that the placement of the organic cap on 53 Luzerne and selection of the cheaper cap upgrade to the containment cell at 51 Luzerne demonstrates that it was not a permanent solution to remove the source of the PCB contamination.  The State also points to various maintenance agreements and plans that took note of the "finite life" of the containment cell.  Dkt. No. 49 at 18.

In response to the State's arguments, GE argues that the State and the EPA's explicit characterization of the containment cell, along with its implicit actions, demonstrate that the agencies considered the containment cell to be a permanent remedy. Dkt. No. 46-8 at 26. GE provides that "[c]ourts . . . find significant how the plaintiff in the cost recovery-action has characterized the response action at issue[,]" and here, the State characterized its actions as remedial. Id. (citing Schaefer, 457 F.3d at 204).

GE points to various documents in the record wherein the State characterized the containment cell as "closed" or "remedial," subject only to monitoring. GE argues that the State publically characterized the containment cell as a "completed" and "remedial work" from 1980 to 2000. Dkt. No. 46-8 at 16. GE suggests that the fact that the State did not include the Alkes scrap yard at 53 Luzerne in its 1979 Declaration listing hazardous properties demonstrates that it did not consider it to be an emergency. Dkt. No 46-8 at 13 (citing Dkt. No. 46-3 at 248). GE cites to the fact that, on November 9, 1979, the State reported to Commissioner Flacke that "[a]ll of the contaminated material has been deposited in the disposal pit, filling it to near capacity," Dkt. No. 49-1 at 11 (citing Dkt. 46-3 at 269), and there is no evidence that the State informed the EPA that it was unable to fully remove all of the contaminated PCBs from the Luzerne site before 1986. Dkt. No. 49-1 at 21.

Further, GE cites to various documents wherein the State addressed the containment cell as a "remedial" action. GE points to two memoranda sent between DEC staff shortly after the containment cell was built wherein the work was referred to

as a "remediation project" and the "[c]ompletion of remedial work in West Glens Falls."

Dkt. No. 46-3 at 300, 302.  GE further points to the Annual Report/Registry, "which

constituted the only public dissemination of its [DEC's] views from 1980 until at least

2000."  Dkt. No. 46-8 at 33.  GE notes that the State listed the containment cell under

"Classification E" in the Annual Report – from 1980 to 1983 – and that "Classification E"

indicated that "remedial work is completed" which "denote[s] the need for scheduled

surveillance and chemical analysis for a properly operated or closed and maintained

site."  Dkt. No. 46-8 at 17 (citing 46-3 at 317).  GE additionally notes that the flow chart

included in the First Annual Report defined Classification E sites as: "[r]emedial action

underway; monitoring needed."  Id. (citing Dkt. No. 46-3 at 316, 352 (listing for WGF

disposal site).[19]  The flow chart defined "E" classified sites as "[s]ite properly closed and

maintained; monitoring needed."  Dkt. No. 46-3 at 316.  GE also argues that in Annual

Reports from 1991 to 1994, the containment cell was listed as "completed" under a

heading that required an answer choice whether the "remedial action" was "proposed,"

"under design," "in progress," or "completed"; from 1995 to 2000, the Annual Report

---

[19]  The 1982 Annual Report named the containment cell as the "W. Glens Falls PCB Disposal Site," identified the "type of site" as a "landfill," and described it as

> a chemical waste landfill constructed pursuant to EPA rules and regulations under an emergency declaration by the Commissioner of the Department of Health.  PCB capacitors and contaminated soil were excavated from a residential area and placed in the chemical waste landfill under the supervision of the DEC and DOH.  Site has five (5) monitoring wells and a leachate collection system.  A leak detection system was also installed to assure that the leachate did not leak from the facility.  Clay was hauled to the site with an in-place density of 1x10-7 cm/sec. and served as the liner.

Dkt. No. 46-3 at 351.

stated "remedial action: completed." Dkt. No. 46-8 at 19 (citing Dkt. No. 46-4 at 9, 12, 15, 17, 20, 23, 26, 29). GE contends that the State's designation of the containment cell in the Registry/Annual Report is significant evidence supporting a finding that the State intended it to be a permanent measure because the State listed two other PCB facilities as "temporary," whereas the containment cell's listing did not have such a designation, despite it being an available option. Id. at 33.

GE argues that, when the Act was amended in 1982, requiring that all sites be listed in a Registry in one of five categories, the State chose to list the containment cell in Classification 4, defined as "[s]ite properly closed – requires continued management." Dkt. No. 46-8 at 18. The 1983 Annual Report defined Classification 4 sites as

> sites have been closed, often in conformance with a DEC approvable plan, but need to be sampled or inspected periodically to ensure that containment removal has been complete, or to otherwise check the site status. Monitoring at these sites may be required indefinitely, and these sites will not be removed from the registry.

Dkt. No. 46-3 at 345. GE points also out that two DEC employees, John Strang and Ray Cowen, testified that sites listed in Classification 4 "were sites that had been subject to a remedial action" and where "further work wouldn't be necessary, at least not immediately." Dkt. No. 46-8 at 33 n.15 (citing Rosenthal Exh 6 at 6-7, 14-15, 58; Rosenthal Exh 3 at 13).

GE further contends that, the fact that the containment cell ended up being inadequate does not mean that the remedy was a removal. Dkt. No. 46-8 at 26. Citing FirstEnergy, GE notes "what seems final at a given point in time might come to appear inadequate at a later date as scientific knowledge progresses." Dkt. No. 46-8 at 26. GE

contends that the original clay cap "was but one major component of the PCB landfill," and one that was consistent with TSCA approval.  Dkt. No. 46-8 at 28-29.  Thus, GE suggests that because the containment cell was intended to be a permanent remedy, the fact that it ended up leaking and an alternate option was necessarily adopted to contain the hazardous waste does not mean that the initial response was a removal.

GE next argues that the State's actions have also demonstrated that the containment cell was a permanent remedy.  GE argues that the recapping of the containment cell in 1986 amounted to a "further remedial action" as "DEC's action to recap the PCB Landfill provides additional evidence that DEC intended the landfill to be a long-term remedy."  Dkt. No. 66-8 at 31.  GE indicates that DEC employees involved in the recapping project characterized it as a 'secondary remedial program' and the 'West Glens Falls PCB Disposal Site remedial program.'"  Dkt. No. 48-8 at 31 (citing SUMF ¶¶ 63, 65).  GE notes that the recapping with the synthetic liner demonstrates that DEC "expected the . . . liner to last at least 20 years, as evidenced by the warranty for the liner that the agency purchased."  Id. at 32 (citing 46-8 at 32).  Further, although acknowledging that the EPA's letter approving the containment cell noted that it did not consider it to be a permanent remedy, GE highlights that the approval "contained neither a fixed period for which the approval would be valid nor a deadline to relocate the PCB waste."  Dkt. No. 46-8 at 14-15.  Thus, GE argues that the EPA nor the State associated the containment cell with a finite period of time.  Id.

The State responds that its agencies' and employees' use of the term remedial or remedy is not dispositive in determining the appropriate statute of limitations as the

Second Circuit recognized in <u>FirstEnergy</u> that those terms can often be used in

theirevery day, plain-meaning sense.  <u>See</u> <u>First Energy</u>, 766 F.3d at 233.[20]  The State

does not explicitly address the related but separate argument that it characterized the

cell as closed/completed.

### 3.  **Nature of Cleanup/EPA Approval**

Finally, GE argues that the type of the cleanup – which involved capping the site

of the hazardous waste – is in the nature of a remedial action.  Dkt. No. 46-8 at 27.   GE

directs the Court to the statute itself, arguing that the State's clean up acts fall within the

statute's own examples of categories of clean ups that fall under a remedial action.

 Indeed, the statute includes "confinement, perimeter protection using dikes, trenches,

or ditches, [and] clay cover" as well as "collection of leachate" and off side disposal of

hazardous substances as examples of remedial actions.  42 U.S.C. § 9601(24).

GE argues that the containment cell was a hazardous waste landfill permitted

under the TSCA and met the requirements EPA required of permanent hazardous waste

landfills.[21]  Dkt. No. 46-8 at 27.  GE argues that the State's actions demonstrate that its

---

[20]    Although the State does not refer directly to Robert Schick's amended declaration in its opposition to GE's motion for summary judgment, wherein he contends that, "throughout [his] DEC career, DER staff often used the common, everyday practical meanings of the words 'remedial' and 'remediation' to refer to a broad variety of activities relating to addressing threats from hazardous wastes"  Dkt. No. 59-2 at 5, their argument and citation to <u>Next Millennium</u> suggests this connection.  In the Court's January 24, 2017 Memorandum-Decision and Order, the Court denied GE's request to disregard or strike the portion of Mr. Schick's declaration, concluding that "the fact that the declaration fails to explain the basis of these [] observations . . . goes to the credibility and weight, rather than the admissibility of the statement.  Dkt. No. 63 at 29-30.

[21]    GE argues, later in its brief, that the State eventually was in violation of its TSCA approval when the containment cell began to leak.  Dkt. No. 46-8 at 20.

chosen remedial measure was the creation of a hazardous waste landfill for which it intended to be the permanent remedy.  In support of this argument, GE contends that the State's installation of a clay cap "was but one major component of the PCB Landfill, consistent with the definition of 'remedial action' under Section 101(24) of CERCLA." Dkt. No. 46-8 at 28 (citing U.S. v. Navistar Intern. Transp. Corp., 152 F.4f 702, 712-13 (7th Cir. 1998)).  GE notes that, in the TSCA approval, the State was required to place "a one-foot clay cover . . . . on the Site" with a "permeability of equal to or less than 1 x 10$^{-7}$ cm/sec," and that the State exceeded this requirement when it capped the containment cell.  Id.  GE refers to the fact that the PCB landfill met or exceeded the specifications in an 1989 EPA guidance document, "Technical Guidance Document: Final Covers on Hazardous Waste Landfills and Surface Impoundments."  Dkt. No. 46-8 at 31 (citing Dkt. No. 46-6 at ¶ 16; Dkt. No. 46-7 at 27-48).

GE stresses that the fact that the EPA approved the containment cell as a TSCA -permitted landfill further supports its argument that the State undertook a remedial action because, "[t]he applicable regulations expressly require that capacitors containing PCBs 'shall be disposed' at a 'chemical waste landfill' or 'incinerator.'"  Dkt. No. 46-8 at 31 (quoting 20 C.F.R. § 761.41, 761.10(b)(2)).  GE contends that the containment cell was intended to be a permanent remedy because the regulations "made clear that chemical waste landfills were *not* to be used for storing PCB waste.  Instead, storage of PCB waste (as opposed to disposal, as authorized by EPA here) was considered a *temporary* measure *pending disposal in a landfill.*  Id. (citing 40 C.F.R. §761.42(a)). Further, GE argues that, despite Dr. Dewling's agreement in his October 1979 letter that

he did not consider the landfill to be a permanent remedy, the fact that Dr. Dewling, in his approval letter, did not set conditions "regarding the longevity of the landfill, despite the fact that the Regional Administrator was authorized to 'include a fixed period of time for which the approval is valid' indicates that the containment cell was intended to be a permanent remedy, and, thus, the cleanup was a remedial action.  Dkt. No. 46-8 at 30 (quoting 40 C.F.R. 761.41(c)(3)(ii)).  GE argues that, despite Dr. Dewling's statement in the October 1979 letter, "the agency's consistent actions over the next two decades after issuance of the TSCA Approval demonstrate that it considered the Landfill to constitute a completed remedial action."  Id. at 31.

The State contests GE'sa rgument that the containment cell is a chemical waste landfill, and disputes that the October 23, 1979 letter from the EPA amounted to a "permit with regard to the West Glens Falls Facility."  Dkt. No. 49-1 at 8.  The State argues that several EPA regulations were waived in the construction of the containment cell, and that it was not built to the specifications required of chemical waste landfills. Dkt. No. 49 at 10 (citing Dkt. No. 46-3 at 232).

### 4.  Analysis

In New York State Elec. and Gas Corp. v. FirstEnergy Corp., 766 F.3d 212 (2d Cir. 2014), the defendant, FirstEnergy Corp., as GE does here, contended that the cleanup was a remedial action.  The plaintiff, New York State Electric and Gas

Corporation ("NYSEG")[22] investigated coal tar that was seeping into the river. NYSEG

entered into a consent order with the DEC to undertake work to prevent the coal tar

from reaching the river, and to clean up the tar that was already in the river. Id. at 232.

NYSEG performed the following work in 1981, pursuant to a consent order:

> built a slurry wall around the lagoon to isolate the coal tar, as
> well as a second slurry wall to catch any coal tar that made it
> past the first wall. It also excavated contamination from the
> river, filled in excavated areas with clean fill, capped
> containment areas, and constructed a treatment system for
> the water collected from behind the slurry wall . . . . This
> project took one year and cost less than $2 million.

Id. After further investigation revealed coal tar in the river after the work had already

been completed, between 1997 and 2000 NYSEG "conducted further study" and in 2002

"excavated and removed waste from three gas holder foundations, coal tar-containing

process pipe, and MGP associated structures." Id. In 2004, the DEC issued a record of

decision requiring additional remedial efforts. Id. NYSEG performed the remedial work,

which cost it nearly $30 million between 1994 and 2009. Id. NYSEG sought cost

recovery from FirstEnergy, and FirstEnergy argued that the original clean up in 1981

pursuant to the consent order was a remedial action; thus, all cost recovery efforts are

time barred. Id.

The Second Circuit, agreeing with the District Court, concluded that the 1981

clean up – placing of the two slurry walls, and the $2 million project, "was more akin to a

removal than a remedial action." 766 F.3d at 233. The Court determined relevant the

---

[22] NYSEG is a "former subsidiary" corporation that commenced the CERCLA action against
FirstEnergy, its "former parent's successor," in order to recover the costs it "incurred in remediating coal
tar contamination at certain of NYSEG's manufactured gas plants[.]" FirstEnergy, 766 F.3d at 216.

fact that

> [t]his cleanup was a discrete project designed both to
> prevent coal tar from reaching the river and to remove it from
> the river.  It was not designed to clean up contamination at
> the source, namely by removing the coal tar from the area
> around the MGP [site of the source of the contamination].
> Instead . . . , '[t]he evidence at trial reflected that neither DEC
> nor NYSEG envisioned the project as encompassing a
> CERCLA-quality clean-up of *the entire MGP site.*  As we
> noted in Next Millenium, measures taken to minimize and
> mitigate contamination, but not to permanently eliminate it,
> are properly classified as removal actions.

Id. at 233 (internal citations omitted).

Further focusing on the immediacy of the remedy, the Court referenced the fact

that the 1981 clean up

> was an immediate response to a health concern about coal
> tar in the Saranac River.  DEC first became aware of the
> problem in the mid-1980s and by 1981 had a Consent Order
> in place with NYSEG.  Moreover, the cleanup was not a
> 'permanent' solution designed to remove the ultimate source
> of the contamination at the MGP.  Rather, it involved building
> slurry walls to contain coal tar from further migrating into the
> river.  These actions were not "designed to remedy the
> underlying source of the contamination, namely, the
> hazardous waste at the [MGP]."

Id. (quoting Next Millenium, 732 F.3d at 127).  The Court contrasted the 1981 clean up

with work performed years later, in 2002 and pursuant to a 2004 ROD, and concluded

that the latter two efforts were "designed to remediate the pollution at its source."  Id.

The later work "included excavating the former MGP tar lagoon and surrounding area,

moving an entire substation and corresponding electrical wires, the relocation of a

sewer line, and the removal of over 150,000 tons of soil."  Id.  The 2004 clean up took

"several years and cost over $29 million, with costs expected to rise to $54 million."  Id.

Thus, the Court determined that the 2004 work was "clearly designed to permanently remediate the coal tar on the site" and the substantial cost further demonstrated that it was a remedial action.  Id.

Here, as in FirstEnergy, the excavation of PCB-laden waste at 53 Luzerne Road and the creation, capping, and re-capping of the containment cell at 51 Luzerne Road "is more akin to a removal action than a remedial action."  766 F.3d at 232.  Despite the State not including 53 Luzerne Road in the 1979 Declaration discussing the six residential properties in West Glens Falls, early on, the State identified the condition of the PCB-contamination at 53 Luzerne, the former Alkes site, as an emergency.  See, e.g., Dkt. No. 46-3 at 263 ("swiftly-implemented solutions are necessary to stop PCB volatilisation in the area and to protect local residents"); Dkt. No. 46-3 at 264 ("emergency situation in West Glens Falls . . . finding that operation of the landfill will not present an unreasonable risk of injury to the health and environment."); Dkt. No. 49-3 at 2 ("the immediacy of the present situation").  Further, the Court agrees with the State that the plans and creation of the containment cell demonstrates the urgency of the matter.  Like in FirstEnergy, where the Court found significance in the fact that DEC became aware of the contamination in the "mid-1980s[23] and by 1981 had a Consent Order in place with NYSEG," the State became aware of the contamination in approximately June 1979 and, within three months, had designed the containment cell.  Dkt. No. 48-1 at 6.  In September 1979, the DEC, DOH, City, County, and Town

---

[23]  It appears that "mid-1980s," is a clerical error, and that the text intended to read, "in mid 1980," as the consent order was in place by 1981.  FirstEnergy, 766 F.3d at 232.

entered into a municipal agreement.  Dkt. No. 49-1 at 7.  On October 1979, EPA

authorized the containment cell subject to various conditions being met.  Id. at 7.  In

September and October of 1979, the State excavated waste from 53 Luzerne and

constructed the containment cell at 51 Luzerne.  Dkt. No. 59-1 at 9.[24]  All of the initial

work was completed on the containment cell by November 1979.  Dkt. No. 49-1 at 11.

Like in FirstEnergy, the cleanup measure was initiated almost immediately after the

State became aware of the PCB-contamination.  766 F.3d at 232.

Furthermore, as the State points out, the excavation, capping, and recapping

cost approximately $500,000, a cost that is far closer to a removal action than a

remedial action.  Dkt. No. 49 at 13. The Court agrees that it is telling that the State, on

more than one occasion, chose the less expensive option than other more expensive

and more permanent options, further suggesting that it intended the containment cell to

be a finite measure.  Id. at 17.  As in FirstEnergy, where the Second Circuit found

significant that the 1980s clean up cost approximately $2 million, when compared with

the approximately $30 million cost of the 1994 to 2009 clean up, the significantly lower

cost of the containment cell, when compared with the cost of excavation and

incineration is substantial.  The lower cost and shorter timeline of the excavation and

capping further supports that the State's actions were a removal.

In addition, the evidence supports that the State did not intend the containment

cell to be a permanent remedy to the PCB-contamination at 53 Luzerne.  Although GE

---

[24]  The State excavated the six residential properties from October 29, 1979 through October 31, 1979 and placed the PCB-contaminated materials in the containment cell at 51 Luzerne.  Dkt. No. 49-1 at 10.

cites to several instances of the State referring to the project as "remedial" or "complete," and although consideration of how the State characterizes the action is a relevant factor, this factor is not dispositive. The Second Circuit has held that "generic uses of the term remedial do not require a finding that the measures were remedial in the statutory sense at they time they were implemented." Next Millenium Realty, 732 F.3d at 129. Although there are many instances of the State referring to the project as "remedial," "remedy," or "complete," there are also several instances of the State noting that the containment cell and recapping project was temporary measure or a mitigation, and that actions were taken until a permanent solution could be enacted. Further, the Court finds significant that, early on, it was acknowledged that the containment cell was not a permanent or long-term solution, and that the containment cell clean up did not remove all of the hazardous waste at 53 Luzerne. Further, the evidence supports a finding that the organic cap that the State spread over the portion of 53 Luzerne that still contained PCB waste was not intended to eliminate the waste, rather mitigate it. Dkt. No. 49 at 16 (citing Dkt. No. 47-8 at 63) ("mitigate exposure until such time a final remedial action could be implemented."). As the Second Circuit has held, "measures taken to minimize and mitigate contamination, but not to permanently eliminate it, are properly classified as removal actions." FirstEnergy Corp., 766 F.3d at 233.

Also convincing is the fact that the State was aware of permanent options for the PCB waste, but declined to implement them due to the immediacy of the situation. In 1979, it was recognized that the preferred method for addressing the PCB waste was incineration, but that the immediacy of the contamination, and the few incineration

options, made the permanent remedy unfeasible at the time.  The State was presented

with options to permanently eradicate the PCB contaminated soil, but determined that it

was not an option because such a solution could take several years, which was

inconsistent with the immediacy of the contamination.  Further, although this case is

distinct from <u>FirstEnergy</u> insofar as the State removed at least some of the hazardous

material from the original site of contamination, 53 Luzerne, and placed it in the

containment cell at 51 Luzerne rather than containing it at the original point of

contamination, it is comparable because, as in <u>FirstEnergy</u>, the initial measures were

taken to prevent further spreading and contamination.  <u>FirstEnergy Corp.</u>, 766 F.3d at

233.

　　　The fact that it took approximately twenty years for the State to begin to

implement a permanent remedy may go to the issue of whether the State complied with

the National Contingency Plan or whether it is liable under Sections 107(a) and 113(f)

for costs associated with the clean up, but it does not mean that the initial action taken

was remedial.  Accordingly, insofar as GE moves for summary judgment on the grounds

that the staute of limitations has expired, because the Court concludes that the 1979

excavation, 1982 capping, and 1986 recapping were actions taken pursuant to a

removal, the statue of limitations did not begin to run at that time.  Thus, GE's motion for

summary judgment on this ground is denied.

## B.  Unjust Enrichment

　　　The State argues, in the alternative, that

> [t]o the extent not awarded to the State on its claims for cost recovery pursuant to CERCLA, GE is liable to the State for the payment of costs and expenses incurred in addressing the hazardous substance contamination at and near the Site, including, but not limited to, all costs of investigation, remediation, oversight, operation, maintenance, and management.[25]

Compl. at 17.  GE argues that plaintiff's unjust enrichment cause of action should be dismissed as it is barred by the statute of limitations.  Dkt. No. 46-8 at 38-39.

GE further argues that the State's unjust enrichment claim is barred by the statute of limitations because, if it had any obligation to the State,[26] such obligation was triggered by the State's "selection of a remedy consistent with CERCLA."  Id. at 39.  GE argues that, when it reimbursed the State approximately $300,000 in 1980, the State selected its remedy; thus, the statute of limitations expired in 1986.[27]  In the alternative, GE argues that, even if it still owed the State a duty after 1980, it was triggered in 1996, when the State requested that GE discuss with it a settlement regarding the leaking containment cell, and GE refused, stating that the "site is the responsibility of New York and not GE."  Id.  GE further argues that, even if the obligation continued after 1996,

> any obligation for GE to remedy the site was triggered at the latest upon DEC's selection of the remedy in March of

---

[25]  The State seeks the Court's review of this argument pursuant to this Court's supplemental jurisdiction.

[26]  The Court recognizes that "GE in no way concedes that it owed Plaintiff's a duty[.]"  Dkt. No. 46-8 at 39.

[27]  GE's selection of 1986 would appear to refer to the fact that all clean up claims occurring prior to 1986 accrue in 1986 due to the amendments to the Act.

> 2005.[28]  However, no matter what date one chooses
> between DEC's implementation of the initial remedy in 1979
> or its selection of a changed further remedy in February
> 2008,[29] the six-year statute of limitations under CPLR 213(1)
> expired prior to Plaintiffs['] filing suit on June 19, 2014.

Id. at 39.

In support of its argument, GE directs the Court to Town of Oyster Bay v. Occidental Chem. Corp., 987 F. Supp. 182, 210 (E.D.N.Y. 1997).  In Oyster Bay, the Eastern District of New York concluded that the defendant's "obligation to contribute to the remediation was triggered by the EPA's 1990 letter and its subsequent selection of appropriate remedial action later that year," thus, the Court measured the statute of limitations from the 1990 selection of remedy.  Id.  As the action was commenced in 1994, within the six-year statute of limitations, the unjust enrichment claim was timely. Id.  The State argues that the GE's obligation to remedy was not triggered by GE's rejection of the 1996 settlement proposal, the selection of a remedy in the March 2005 Record of Decision, or the February 2008 remedy selected in the Explanation of Significant Differences.  Dkt. No. 49 at 32.  Instead, the State contends that the obligation was triggered, for statute of limitations purposes, by the February 2010 demand for costs it presented to GE after implementing a permanent remedy.  Dkt. No.

---

[28]  March 2005 is the date the State issued a Record of Decision, in which "it presented '[t]he selected remedy for the Luzerne Road Site consist[ing] of excavation and on-site thermal treatment of contaminated soils including the PCB cell (Soil Alternative 4), along with long-term monitoring of the on-site groundwater (Groundwater Alternative 2).'" Dkt. No. 49-1 at 51, ¶199.

[29]  February 2008 is the date that the State issued its Explanation of Significant Differences, providing "an alternative option allowing for 'the disposal of waste containing PCBs greater than 50 ppm to be excavated and disposed off-site in a secure landfill permitted to accept this waste.'"  Dkt. No. 49-1 at 54 ¶¶ 125-26.

49 at 32.  The State argues that February 2010 is the proper date from which the Court should measure the six-year statute of limitations because the February 2010 letter "was clearly a formal 'demand,' while the October 2005 letter does not make a demand."  Id. at 33.  Further, the State contends that the February 2010 letter "expressly states that 'GE is liable'" whereas the October 2005 letter "merely describes GE as a 'potentially' responsible party and 'requests' participation in implementing the remedy."  Id.  The State appears to argue that the statute of limitations begins to run when the potentially responsible party is presented with an definitive and unambiguous demand letter for reimbursement.  Id. at 32-33.

The only case the State cites in support of this portion of its unjust enrichment section is Elliott v. Qwest Communications Corp., 25 A.D.3d 897, 898 (3d Dep't 2006), a one-page decision that does little more than lay out the statute of limitations standard. The State cites no case, nor could the Court locate one, that requires a party to use as specific language as the State suggests in order for a request for contribution to amount to a demand.  The Court, however, is unable to review the October 2005 letter, as plaintiff has not provided a proper citation to this document, nor has the Court's review of the record located such letter.[30]

---

[30]     In its memorandum of law in opposition to GE's motion for summary judgment, in referencing an October 2005 letter, the State cites its Statement of Facts at paragraph 15.  Dkt. No. 49 at 32. However, paragraph 15 of plaintiff's statement of facts does not reference the October 2005 letter.  The Court also reviewed whether paragraph 15 of plaintiff's statement of facts in support of its motion for summary judgment may be the document the State had intended to cite, yet this paragraph also did not provide such support.  Even after a painstaking review of the record, the Court is entirely unable to identify which document the State intended to refer when referencing an October 2005 letter to GE.  Review of GE's memorandum in support of its motion for summary judgment also does not allow the Court to locate this letter, as GE does not cite this letter in its section arguing for dismissal of the unjust enrichment claims.  Dkt. No. 46-8 at 38-39.  Unfortunately, this kind of citing is not unusual for the parties.  Throughout their motions and responses, parties both cite to their various statements of material fact, which in turn cite

The Court agrees with GE that the State selected its remedy in 2005, when it issued an ROD and sought reimbursement from GE.  Even though the State later altered its remedial plan by issuing an ESD, the State chose a remedial action consistent with CERCLA in October 2005, and issued a letter requesting compensation for this remedy to GE.  Were the Court to adopt the State's approach, it would seem that an unjust enrichment deadline could continuously be put off by forward-thinking plaintiffs carefully crafting the wording of their contribution requests so as to not be too definitive as to set the statue running, or by not contacting potentially-responsible parties until the very last minute to also avoid setting off the statute.

Although unjust enrichment is an equitable remedy, it is entirely reasonable for the statute of limitations to begin to run when the State chose its remedial measure and sought payment for this measure.  Thus, at the latest, the statute began to run in October 2005, and expired in October 2011.  Accordingly, GE's motion for summary judgment is granted insofar as the State's claim for common law unjust enrichment is dismissed as it is time-barred.

### C.  Can GE be held Liable Under CERCLA?

In its motion for partial summary judgment, the State seeks a finding that GE is liable because it "arranged" for the disposal of hazardous substances.  Dkt. No. 47-9 at

---

o several declarations, which then cite to exhibits appended to those declarations – all without tables of content to easily locate those exhibits.  The parties then frequently change their citation form, citing at times to "PL" numbers, and then switching to citing paragraph numbers.  The citation approach the parties have adopted is frustrating at best, and has made it exceeding trying for the Court to identify and locate the documents they rely on in support of their motions.

17.  In its motion for summary judgment, GE seeks a finding that it is not an "arranger" under CERCLA because it did not "'arrange' for the disposal of capacitors containing hazardous substances at 51 Luzerne Road."  Dkt. No. 46-8 at 40.  Further, GE contends that there are material questions of fact as to whether it "arranged" for the disposal of capacitors at 53 Luzerne Road.  Dkt. No. 40 at 12-18.

Under 42 U.S.C. § 9607(b), for a party to seek contribution from another for costs associated with cleaning up hazardous waste, the party seeking reimbursement must demonstrate the following:

> First, the defendant falls within one of the four categories of potentially responsible parties set forth in § 107(a) (42 U.S.C. § 9607(a)).  See [B.F.Goodrich v. ]Betkoski, 99 F.3d [505,] 514.  The categories include:
>
> (1) the owner and operator of . . . a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such persons . . . . 42 U.S.C. § 9607(a).
>
> Second, the facility is indeed a "facility" as defined by § 101(9) of CERCLA (42 U.S.C. § 9601(9)).  See Betkoski, 99 F.3d at 514.

Third, "there is a release or a threatened release of hazardous substances at the facility." <u>Id.</u>; <u>see</u> 42 U.S.C. § 9607(a)(4).

Fourth, the plaintiff incurred costs in responding to the release or threatened release ("response costs"). <u>See</u> <u>Betkoski</u>, 99 F.3d at 514; 42 U.S.C. § 9607(a)(4).

And fifth, the costs incurred conform to the National Contingency Plan. <u>See</u> <u>Betkoski</u>, 99 F.3d at 514; 42 U.S.C. § 9607(a)(4)(A) & (B).

<u>Prisco v. A & D Carting Corp.</u>, 168 F.3d 593, 602-03 (2d Cir. 1999).[31]

## 1. Are 53 and 51 Luzerne a single "facility"?

GE argues that the State is unable to demonstrate that the "two parcels DEC belatedly dubbed the 'Site' constitute a single 'facility' within the meaning of Section 101(9) of CERCLA." Dkt. No. 48 at 8. GE contends that the State, "[k]nowing that GE lacks any nexus to hazardous substances disposed at 51 Luzerne Road . . . attempt[s] to tie GE's liability to its activities at the so-called 'Site' . . . define[d] as including both '51 and 53 Luzerne Road.'" Dkt. No. 46-8 at 42. The State argues that, because CERCLA "defines 'facility' to include 'any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located' . . . to show that the Site is a 'facility,' the State need only show the presence of a hazardous substance there." Dkt. No. 47-9 at 17 (citing <u>Burlington N. R.R. Co. v. Woods Indus., Inc.</u>, 815 F. Supp. 1384, 1392 (E.D. Wash. 1993)). The State further provides that,

---

[31] It is undisputed that (1) there has been a release or threatened release of hazardous substances – though the "location" of the release may be disputed; and (2) that the State incurred response costs relating to this release/threatened release of hazardous substances. Dkt. No. 48 at 8 n.3.

because  hazardous substances were found at 53 Luzerne in June 1979, "the Site, where hazardous substances have come to be located, clearly meets the definition of a 'facility.'" Id. The State contends that 51 Luzerne and 53 Luzerne should be considered one "facility" because they share a common source of contamination.  Dkt. No. 58 at 17.

> CERCLA defines "facility" as:

> > (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

As 53 Luzerne Road, the former Alkes scrapyard location, is a place where hazardous substances were deposited or disposed, it meets the "broadly" defined scope of "facility."  42 U.S.C. § 9601(9); MPM Silicones, at 2016 WL 3962630, at *26. Similarly, as 51 Luzerne Road is a place where hazardous waste was either "stored" or "deposited," it too meets the broad definition of "facility" under section 9601(9).  This does not end the analysis, as it must be determined whether 53 and 51 Luzerne together – the "Site," as the State designates – may be considered a "facility" under CERCLA.

GE argues that "there is no physical or operational connection between the two parcels," noting that "[a]t all relevant times," the City of Glens Falls owned 51 Luzerne Road, and 53 Luzerne Road "was owned by private commercial interests."  Dkt. No. 46-

8 at 43.  GE further contends that, after constructing the containment cell, "DEC treated the two parcels as separate sites from 1979-90."  Id.  Ultimately, GE argues that, "because of the lack of any cogent explanation for linking the two parcels together as a single facility, the Court should treat the parcels separately for the purposes of determining liability."  Id. at 43-44.  In support of its arguments, GE relies on Niagara Mohawk Power Corp. v. Consolidated Rail Corp., 291 F. Supp.2d 105, 125 (N.D.N.Y. 2003), aff'd in part, rev'd in part on other grounds sub nom. Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 291 F. Supp. 2d 105 (2d Cir. 2003).

In Niagara Mohawk, the plaintiff, a party that was determined to be responsible for the release of hazardous waste at its manufactured gas plant ("MGP") facility, was attempting to hold the defendant, the current owner of property adjacent to the plaintiff's property, the "Railway Property," responsible for contributing to the cleanup of the Railway Property, which was contaminated by coal tar that migrated there from the MGP facility.  291 F. Supp 2d at 124-25.  In declining to permit the plaintiff to define the CERCLA "facility" to include the defendant's Railway Property, the Court found significant that the "Railway Property and the property upon which the MGP operated have not shared an owner since at least 1845" and that "[t]here is no evidence that they have ever been under common control."  Id. at 125.  Further, the Court concluded that, "[b]ecause the Railway Property is naturally divisible from the remainder of the . . . Site, and at least in the last 150 years has had no connection with the property upon which the MGP operated, [the plaintiff]'s current attempts to integrate the Railway Property into the Water Street Site in order to hold [the defendant] liable as a current owner must

be rejected." Id.  The Court provided that "[s]eparate parcels should be considered a single facility if they 'cannot be reasonably or naturally divided into multiple parts or functional units.'  Similarly, where parcels are naturally divisible into parts or functional units, they should not be considered as a single facility.'" Id. (quoting United States v. 150 Acres of Land, 250 F.3d 698, 709 (6th Cir. 2000)).

Although the general concepts regarding divisibility and common ownership are helpful in framing the general "facility" question, the question before the Court in Niagara Mohawk differs somewhat from the question here.  In Niagara Mohawk, although the Court was assessing whether to consider two separate properties with a common source of contamination to be a single facility for CERCLA liability, the Court declined to do so, in part, based on the ownership of the parcels.  291 F. Supp 2d at 125-27.  The underlying issue was whether the defendant could be held liable as a "current owner," which the Court rejected because "it would be untenable to hold [the defendant] liable as a current owner since the undisputed cause of the contamination was the MGP, and [the plaintiff] has already accepted responsibility for the remediation." Id. at 125.  Here, the question is not whether the State can hold GE liable solely due to the fact that it owns or controls a property for which the State is responsible for remediating, but whether the State can hold GE liable for cleanup work that it performed at 51 Luzerne, even though 51 Luzerne is a separate and distinct parcel from 53 Luzerne, the property upon which the State alleges GE arranged for the disposal of hazardous waste.

The State contends that "it is irrelevant that there is 'no migration pathway,'"

between the two properties "and that the parcels have been owned by separate entities" because "the common source of PCBs weighs in favor of holding the [containment cell at 51 Luzerne Road] as part of the same 'facility' as the former Alkes scrapyard site." Id. at 17-18.  The State argues that "'a site with a single source of pollution is almost always considered one 'facility' within the meaning of CERCLA and is generally not divisible absent extraordinary circumstances.'"  Dkt. No. 58 at 18 (quoting MPM Silicones, 2016 WL 3962630 ) and Yankee Gas Servs. Comp. v. UGI Util., 616 F. Supp. 2d 228, 270-71 (D. Conn. 2009)).

        As part of a string cite supporting its contention that the two properties are properly one facility due to the common source of contamination,[32] the State cites, among other cases, New York v. Westwood-Squibb Pharm. Co., Inc., 138 F. Supp. 2d 372 (W.D.N.Y. 2000).  There, the plaintiff sought contribution for cleaning up contamination of a parcel of land referred to as the "Creek Property," which was adjacent to defendant Westwood-Squidd's property, the "Westwood property."  Id. at 375-76.  Another of the defendants, National Fuel, argued that the Westwood and Creek properties should be considered one "facility" "because the Creek Property's contamination was ultimately a result of the hazardous wastes that were created by the Manufactured Gas Plant, which was operated on the Westwood Property from 1987 until 1951."  Id. at 376.  Westwood-Squibb argued that the Westwood Property is a "separate facility" from the Manufactured Gas Pplant; thus, Westwood could not be held

---

[32]    The State cites these cases as part of a long string cite with explanatory parentheticals, but does not provide any further analysis of these cases and why they support a finding that 51 and 53 Luzerne Road should be considered one CERCLA facility.  Dkt. No. 58 at 18.

liable because it was the Manufactured Gas Plant that contaminated the Creek Property, not the Westwood property, and Westwood-Squibb never purchased the Manufactured Gas Plant when it purchased the Westwood property in 1972.  Id.  The Court rejected Westwood-Squibb's theory, "refus[ing] to divide a widely contaminated piece of property (i.e., the Westwood Property) into separate CERCLA facilities. Rather, the court finds that the Westwood Property and the Manufactured Gas Plant . . . share the same type of contaminants and, therefore, should be treated as a single CERCLA facility."  Id. at 379.

Yet, although the Court finds Westwood-Squibb to be somewhat persuasive, it was undisputed that the contamination there came from one source – the manufactured gas plant, which undisputedly contaminated the Creek Property.  Westwood-Squibb, 138 F. Supp. 2d at 379.  Although the contamination at 51 Luzerne Road appears to have come, at least in part, from the PCB-contaminated waste placed in the containment cell from, among other properties, 53 Luzerne Road, the contamination from 53 to 51 was not a natural progression, but a result of the waste being excavated from 53 Luzerne Road and placed at 51 Luzerne Road.

The State further cites MPM Silicones, LLC v. Union Carbide Corporation to support its argument that 51 and 53 Luzerne Road are a single CERCLA facility.  In MPM Silicones, LLC, plaintiff MPM, the current owner of the property at issue, argued that the "Site" – made up of 1,300 acres, including manufacturing operations, solid waste management units, and an active hazardous waste landfill, was one "facility" for CERCLA purposes.  2016 WL 3962630, at *25.  Defendant Union Carbide Corporation

argued that "landfill 2," should be considered a separate "facility" from the rest of the property under CERCLA, largely because it was a quarter of a mile from the rest of the structures.  Id.  The Court declined to consider "landfill 2" a separate facility from the rest of the property, because "landfill 2" had the same source of contamination as the "entire property has been operated by a single owner[.]"   Id. at *27.

What distinguishes the case at hand from those the State cites, and even the case GE cites, is that, while 51 and 53 have a common source of contamination, the common source is neither (1) due to the direct actions of the defendant, or (2) due to natural spreading of the contamination.  Instead, the two parcels have a common source of contamination due to the State's actions in excavating and moving contaminated waste from 53 Luzerne to 51 Luzerne, rather than from GE's direct conduct or solely from the waste's spreading on its own.  As part of its cleanup of 53 Luzerne Road, the State excavated PCB-contaminated materials from 53 Luzerne Road and placed them into a containment cell on a separate, though adjacent land parcel at 51 Luzerne Road.  Absent the State's action in moving the PCB-contaminated waste from 53 Luzerne into the containment cell at 51 Luzerne, the State has not demonstrated that the PCB waste at 53 Luzerne would have contaminated 51 Luzerne. Dkt. No. 46-6 at 10-11.  Further, the two properties did not have a common owner at the time of the contamination – 53 Luzerne was owned and operated by Alkes/AMG Corporation from 1951 to 1976.  Dkt. No. 47-1 at 3.  The City of Glens Falls owned 51 Luzerne Road until 1986, when the State became the owner.  Dkt. No. 49-1 at 2.  The properties were not operated as a single unit together, and had no connection until the

State placed 53 Luzerne's waste onto 51 Luzerne.  Cf. MPM Silicones, 2016 WL 3962630, at *26 ("Courts also look to whether the areas in question were jointly managed or operated.").  The fact that the State, in 1990 began to list the two properties as one Site in the Registry does not require a different finding, as the State's designation of the two properties as one "facility" does not make it so.

In sum, although both 51 and 53 Luzerne Road meet the statutory definition of "facility," they cannot together be considered one "facility" for purposes of this CERCLA action.  Therefore, the Court declines to hold that the State cannot consider 51 and 53 Luzerne as a single "facility" under CERCLA.  Accordingly, to determine whether GE can be held liable as an "arranger," the Court must assess whether GE "arranged" for hazardous waste at the two separate facilities – 53 Luzerne Road and 51 Luzerne Road.

### 2.  Did GE Arrange for Disposal of Hazardous Substances?

GE argues that the State is unable to demonstrate that "GE 'arranged' for the disposal of hazardous substances at either 51 or 53 Luzerne Road."[33]  Dkt. No. 48 at 8. As to 53 Luzerne, GE contends that there are disputed issues of material fact surrounding whether: (1) the scrap capacitors found at 53 Luzerne Road "were, in fact, the scrap capacitors transferred by GE to Mr. Alkes," and (2) that GE "had the requisite 'intent' to dispose of PCBs required under Section 107(a)(3) of CERCLA."  Id. at 13.

---

[33]  GE contends that "[a]lthough there is a question of fact regarding whether GE arranged for disposal of hazardous waste at 53 Luzerne Road, it is undisputed that GE played no role in disposing of waste at 51 Luzerne Road."  Dkt. No. 46-8 at 40; Dkt. No. 48 at 12.

Regarding 51 Luzerne, GE contends that there is "no 'nexus' between GE and the hazardous substances disposed at 51 Luzerne Road – a factual prerequisite to a finding that GE is liable for the costs of remediating that parcel." Id. at 11; 46-8 at 40. The State contends that "GE's liability is not based upon direct involvement with the [containment cell] located at 51 Luzerne Road"; rather, its "liability arises from its arranging for the disposal of PCBs at the former Alkes scrapyard facility located at 53 Luzerne Road." Dkt. No. 58 at 18-19. The State argues that it need not show that GE "had any role with the disposal activities once the waste left GE's facilities," and only needs to "prove that GE took steps to intentionally dispose of its waste capacitors, that GE's capacitors were disposed of at the Site and that the disposal of GE's capacitors caused the State to incur response costs." Dkt. No. 49 at 34. The State contends that the fact that GE "entered into a transaction for the sole purpose of discarding a no longer useful hazardous substance" – GE's agreement with Alkes to haul scrap capacitors from its plants – GE is liable for the contamination that occurred when Alkes disposed of the capacitors at 53 Luzerne Road and the contamination that occurred after the capacitors were placed in the containment cell at 51 Luzerne. Dkt. No. 47-9 at 22-25.

CERCLA allows for parties to seek contribution from those who have, "arrange[d] for disposal . . . of hazardous substances." 42 U.S.C. § 9607(a)(3). The Supreme Court of the United States, recognizing that CERCLA "does not specifically define what it means to 'arrang[e] for' disposal of a hazardous substance[,]" concluded that, "under the plain language of the statute, an entity may qualify as an arranger under 9607(a)(3)

when it takes intentional steps to dispose of a hazardous substance." <u>Burlington N. and</u> <u>Santa Fe Ry. Co. v. U.S.</u>, 556 U.S. 599, 610-11 (2009). "Although arranger liability can attach 'to parties that do not have active involvement regarding the timing, manner or location of disposal,' <u>CPC International, Inc. v. Aerojet-General Corp.</u>, 759 F.Supp. 1269, 1279 (W.D. Mich.1991), there must be some nexus between the potentially responsible party and the disposal of the hazardous substance." <u>Gen. Elec. Co. v.</u> <u>AAMCO Transmissions, Inc.</u>, 962 F.2d 281, 286 (2d Cir. 1992). In assessing whether a potentially responsible party "arranged for the disposal . . . of hazardous substances under § 9607(a)(3)," because there is no "bright-line between a sale and a disposal under CERCLA[,]" the Court must participate in "a fact-intensive inquiry that looks beyond the parties' characterization of the transaction as a 'disposal' or 'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." <u>Burlington N. and Santa Fe Ry. Co. v. U.S.</u>, 556 U.S. at 610 (citations omitted).

### a. 53 Luzerne

In opposition to the State's motion for summary judgment on this ground, GE contends that there are disputed questions of fact whether GE is liable as it relates to whether it arranged for the disposal of hazardous substances at 53 Luzerne Road. Dkt. No. 48 at 8. GE "acknowledges both that it transferred scrap capacitors to Mr. Alkes and manufactured capacitors affixed with labels bearing its name," but argues that the State has failed to demonstrate that (1) the scrap capacitors found at 53 Luzerne Road

"were, in fact, the scrap capacitors transferred by GE to Mr. Alkes," and (2) that GE

"had the requisite 'intent' to dispose of PCBs required under Section 107(a)(3) of

CERCLA." Id. at 13.  The State points to the testimony of DEC employees David Tromp

and Gerard Burke who testified that, during the 2008 excavation of the containment cell

on 51 Luzerne, they observed many capacitors with GE labels, as evidence that those

capacitors came from GE's plants through their agreement with Alkes.  Dkt. No. 47-1 at

14 (citing Dkt. Nos. 47-4 at 6; 47-7 at 10).

### i. Capacitors

Although it is not outside of the realm of possibility that the capacitors affixed with

GE labels were not the capacitors transferred from GE to Alkes, such a likelihood is slim

at best.  DEC employee Mr. Tromp testified to seeing "hundreds" of capacitors when the

containment cell was excavated in 2008 – far more capacitors than the State had

anticipated.  Dkt. Nos. 47-3 at 33, 47-4 at 6; 47-7 at 10.  Although it is possible that

Alkes obtained some of his GE capacitors from a source other than directly from GE,[34]

disposed of those capacitors on his property, and those capacitors were then

transferred to the 51 Luzerne containment cell, as GE has conceded that it provided

capacitors to Alkes – who disposed of those capacitors on his property at 53 Luzerne –

and that property was excavated and the material placed in the containment cell at 51

---

[34]  GE contends that it manufactured over 300,000 power capacitors in a month at its Hudson Falls and Fort Edwards plants, and that "GE had multiple customers of capacitors who had their own disposal practices."  Dkt. No. 48 at 14.  GE further contends that 53 Luzerne may have been contaminated by other sources, as there is evidence that the City of Glens Falls landfill "located to the west of 53 Luzerne" "had received some PCB capacitors from private haulers."  Id. at 14 n.6.

Luzerne – the chance that *some* of those GE capacitors were transferred to Alkes from an entity other than directly from GE is not sufficient to amount to an issue of material fact. The "totality of the circumstances" support that the capacitors labeled as manufactured by GE that were located on 53 Luzerne and transferred to the containment cell at 51 Luzerne were transferred from GE to Mr. Alkes pursuant to an agreement or contract between the two parties. Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 136 (2d Cir. 2010).

Although the Court finds that there is no material question of fact as to whether the capacitors found on 53 Luzerne were those that were "deposited" there pursuant to GE's agreement with Alkes, the Court must still assess whether there is a sufficient nexus between GE and the disposal of hazardous substances at 53 Luzerne, and whether there are material questions of fact surrounding this question.

### ii. Intent

GE contends that the State is unable to prove that it transferred the capacitors to Mr. Alkes "with the intent to dispose of PCBs" or "with the intention that at least a portion of the product be disposed of during the transfer process by one or more methods." Dkt. No. 48 at 15. The State argues that the fact that GE entered into an agreement or contract with Mr. Alkes to transfer and/or dispose of the capacitors, and admitted that it transferred the capacitor to "get rid" of them, rather than have its employees bring them to the landfill, suffices to show that GE's intent in the transaction was disposal of the

51

capacitors.  Further, the State contends that the capacitors were not transferred or sold

as a "new" and "useful" product, GE intended to "dispose" of them.  Dkt. No. 47-9 at 24.

In Burlington N. and Santa Fe Ry. Co. v. U.S., the Supreme Court observed that

CERCLA intends to hold liable not only parties who "directly dispose of waste products

but also when they engage in legitimate sales of hazardous substances knowing that

some disposal may occur as a collateral consequence of the sale itself."  556 U.S. at

612.  However, the Court held that,

> while it is true that in some instances an entity's knowledge
> that its product will be leaked, spilled, dumped, or otherwise
> discarded may prove that an entity's intent to dispose of its
> hazardous wastes, knowledge alone is insufficient to prove
> that an entity 'planned for' the disposal, particularly when the
> disposal occurs as a peripheral result of the legitimate sale
> of an unused, useful product.

Id.  Thus, to be liable as an arranger, the party must have entered into the sale

agreement "with the intention that at least a portion of the product be disposed of during

the transfer process by one or more of the methods described in 6903(3)."  Id.  The

Burlington Court further held that, despite evidence that the defendant "was aware that

minor, accidental spills occurred during the transfer" of the hazardous waste, the facts

did not support that the defendant intended that the spills occurred, as the defendant

"took numerous steps to encourage its distributors to reduce the likelihood of such

spills, providing them with safety manuals, requiring them to maintain adequate storage

facilities, and providing discounts for those that took safety precautions."  Id. at 612-13.

Thus, despite the fact that the defendant's efforts "were less than wholly successful," on

the facts before it, the Court concluded that the defendant's "mere knowledge that spills

and leaks continued to occur" was insufficient to demonstrate that the defendant arranged for the disposal of the hazardous waste.  Id. at 613.

The State argues that, because GE admitted that it transferred the capacitors to Mr. Alkes "'to get rid of them, rather than having GE's truck drivers from the [GE] Shipping and Transportation Departments make extra trips to a landfill[,]" no further proof of intent is needed.  Dkt. No. 58 at 22 (citing Dkt. No. 48-1 at 4 ¶¶7-8, Dkt. No. 47-3 at 9-10).  However, GE argues that, the fact "that GE transferred capacitors to Mr. Alkes as an alternative to disposing them in a landfill . . . alone does not make GE liable under Section 107(a)(3)."  Dkt. No. 48 at 15.  GE contends that it sold to Mr. Alkes various substances, "including sludge, steel, tin, copper, iron, corrugated metal, and brass . . . which had economic value," suggesting that the sale/transfer of the product that has a continued value creates a question of fact as to whether GE intended to dispose of the hazardous waste, or whether the spillage was the "peripheral" result of the sale of a still useful product.  Dkt. No. 48 at 17.

In assessing intent, case law dictates this Court to consider whether the transaction was for the sole purpose of disposing of a waste, rather than a useful or potentially useful product.  GE relies on Schiavone v. Ne. Utilities Serv. Co., 08-CV-429 (AWT), 2011 WL 1106228 (D. Conn. Mar. 22, 2011).  In Schiavone, the District Court for the District of Connecticut denied the plaintiffs' motion for summary judgment. Id.  The defendants had sold transformers as scrap to the prior owners of the property (Kasden) that the plaintiffs, the current owners of the property, were required to remediate after the state DEC discovered PCB contamination.  Id. at *3.  The Court

53

noted that some of the transformers that the defendants sold to Kasden were sold for "the commercial value of the metal." Id. at *1. The Court found significant that agreements between the defendants and Kasden documenting the sales demonstrated that the sales "were for the purchase of scrap metal only, and contained no reference to the disposal of PCBs or any other hazardous substance." Id. The Court found that the defendants were not "arrangers" under section 9607(a)(3) because they did not take intentional steps to dispose of hazardous substances, as their "specific purpose of disposing used transformers" was to sell them as scrap metal, rather than to "dispos[e] of any oil that was in the transformers or any PCBs that were in such oil." Id. at *6.

In relevant part, the Schiavone Court concluded that the defendants' "intent to dispose of the transformers themselves is not enough to make them 'arrangers' under § 9607(a), even if the defendants had knowledge that oil was in the used transformers when they sold them to Kasden" because the plaintiffs "have produced no evidence that could support a conclusion that the defendants had as a purpose in their dealings with Kasden disposing of transformer oil containing PCBs." 2011 WL 1106228, at *6. Thus, the plaintiffs failed to show a genuine issue of fact as to whether the defendants arranged for the disposal of a hazardous substance." Id. GE argues that this case is comparable to Schiavone because there is evidence that it intended to sell the capacitors to Mr. Alkes as scrap metal, which is a useful or potentially useful product, and not to dispose of the capacitors as waste.

The State directs the Court to United States v. Dico, Inc., 808 F.3d 342 (8th Cir. 2015) to support its argument that GE intended to dispose of a hazardous substance.

See Dkt. No. 58 at 21.  In Dico, Inc., the defendant, the owner of contaminated

buildings,[35] sold the buildings without informing the EPA, who contracted with a third

party to dismantle some buildings and purchase the other buildings.  808 F.3d at 344.

When the third party tore the buildings down, it stored the buildings' materials in an

open field, and PCBs were later discovered there.  Id.  The third party disposed of all of

the buildings' materials except for the steel beams.  Id. at 345.  The government then

commenced a CERCLA suit against Dico for arranging for the disposal of the

contaminated buildings.  Id. at 346.  The district court found in favor of the government,

concluding that "no reasonable fact-finder could conclude Dico did not intend to dispose

of the remaining PCBs when it sold the buildings to [the third party]."  Id. at 347.  The

District Court, in reaching its decision, relied on (1) "battery cracking" cases wherein the

district courts in those cases found the sellers to be "arrangers" when they sold junk

batteries to third parties who were only interested in the lead in the batteries, and, thus,

would have to remove the batteries' casings to access the lead; and (2) a decision

wherein the seller sold scrap copper wire, knowing that the buyer was only interested in

extracting the copper, and would thus remove the insulation material covering the wire

and dispose of it.  Id. at 347-48.  The Eighth Circuit concluded that the District Court

relied too heavily on the battery-cracking cases and the "usefulness" of the product.  Id.

at 347-48.

The Eight Circuit observed that "[w]here . . . the sale product has some

---

[35]  Dico was under an EPA order regulating the use of the buildings because the buildings were
contaminated with trichloroethylene, pesticides, and PCBs.  808 F.3d at 346, 350.

commercial value and was part of a legitimate sale, even if the seller knows disposal will result, it is more difficult to hold that no reasonable juror could find the seller did not actually intent to sell the product but merely intended to discard the hazardous substance." Dico, Inc., 808 F.3d at 348.  The Court noted there was no evidence in the case before it that showed that the defendant considered the buildings it sold to be "useless," and that the evidence supported that "Dico continued to view them as commercially useful." Id. at 346, 350.  The Court concluded that, the fact that Dico knew the buyer would only use part of the contaminated goods and would discard the rest was not sufficient, as a matter of law, to find it liable as an arranger, and that the District Court "focused too closely on the factual similarity between this case and the battery-cracking cases regarding what the buyer was interested in and how it would have to obtain the desired part rather than on the relevant question of the seller's intent with respect to the transaction." Id. at 348.  The Court concluded that, "where the sale product has some commercial value and was part of a legitimate sale, even if the seller knows disposal will result, it more difficult to hold that no reasonable juror could find the seller did not actually intend to sell the product but merely intended to discard the hazardous substance." Id. (citing Schiavone, 2011 WL 1106228, at *6).

The Court held that "the usefulness of a product – however defined – is an important but not dispositive factor to consider in determining the seller's intent. Dico Inc., 808 F.3d at 349.  The Court noted that, rather than focus on the "usefulness" of the product, the focus must be on the intent of the seller:

> A party may sell a still "useful" product, i.e., fit either for its
> intended purpose or some other purpose useful to the buyer,

> with the full intention to rid itself of environmental liability rather than a legitimate sale, for example where the cost of disposal or contamination remediation would greatly exceed its purchase price (e.g., selling a working and useful piece of machinery for $10,000 that comes along with a $100,000 price tag for remediation costs). It appears to us that a seller who knew about the contamination in such a sale, if it can be shown the seller intended to arrange for its disposal because the seller knew the buyer would eventually dispose of it, could fall within the scope of the statute, even though the product may be considered "useful." Thus, the "usefulness" of a product does not dispositively show the character of the transaction or the seller's intent. Rather, the touchstone remains whether "the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions."

Id. at 349.  Thus, the Dico, Inc. Court reversed the District Court's determination that the defendant arranged for the disposal of hazardous substances, noting that it was "heavily disputed" whether the buildings could still be considered to have any value after the cost of the remediation, and "how much cleanup-cost Dico potentially avoided by selling the buildings[,]" and concluded that, the fact that Dico knew the buyer would only use part of the contaminated goods and would discard the rest was not sufficient, as a matter of law, to find liability as an arranger.  Id. at 348, 250.

Here, there is evidence that one of the reasons GE transferred the capacitors to Mr. Alkes, rather than dispose of them, was to sell the capacitors, along with other products, as scrap.  Indeed, there is also evidence that GE had contracts or agreements with Mr. Alkes to sell what may be a substantial amount of scrap product.  However, the record does not contain evidence as to the amount of profit GE received for the sale of the capacitors to Mr. Alkes, or whether the transfer of the capacitors to Mr. Alkes, rather than GE transferring them to a landfill, at the time resulted in cost savings to GE.

Although, unlike in Schiavone, there is evidence that at least one reason GE transferred the capacitors to Alkes was so that it would not have to have its drivers bring the capacitors to a landfill, the Court cannot conclude, as a matter of law, that GE primarily transferred the capacitors as a means to dispose them. Furthermore, the fact that there is evidence that GE was aware that Mr. Alkes was only interested in the scrap metal, and that the remainder of the product would need to be disposed, Dico, Inc. is persuasive to this Court insofar as it held that such knowledge, alone, is insufficient t find that a seller "intended" to dispose of a hazardous waste. 808 F.3d at 349.

Accordingly, GE's motion for summary judgment and plaintiff's motion for partial summary judgment on this ground are denied as there are disputed issues of material fact as to whether GE "intended" to dispose of a hazardous substance. Thus, the Court cannot determine, as a matter of law, whether GE arranged for the disposal of hazardous substances to 53 Luzerne Road.

### b. 51 Luzerne

GE contends that the State is unable to demonstrate a nexus between itself and 51 Luzerne. Dkt No. 46-8 at 40; Dkt. No. 48 at 11-12. GE argues that "based upon DEC's intervention in 1979, it cannot be plausibly shown . . . that GE any longer *owned* or *possessed* the hazardous substances at issue or even had the ability to exercise control over such substances," and that any "obligation" it may have had "to exercise control over hazardous substances transferred from its Hudson Falls facility to Richard Alkes in 1952-65 concluded once DEC took full control of and moved those substances

to a different location in 1979." Dkt. No. 46-8.  In responding to GE's argument that it

did not arrange for disposal at 51 Luzerne, the State contends that it

> has never suggested that the State's 'removal' activities
> somehow form the basis of the company's liability for costs
> incurred at the Luzerne Road Site.  Rather . . . GE's liability
> arises from its arranging for the disposal of PCBs at the
> former Alkes scrapyard facility located at 53 Luzerne Road.
> Indeed, 51 Luzerne Road is merely the location were [sic]
> the State secured the PCB wastes removed from the
> adjacent former Alkes scrapyard until implementation of a
> permanent remedy.[36]

Dkt. No. 58 at 18-19.  As the Court has determined that 51 and 53 Luzerne are separate

facilities, rather than one "site," it must be determined whether the Court can conclude,

as a matter of law, that GE "arranged" for the disposal of hazardous waste at 51

Luzerne Road due to its possible arrangement of hazardous waste at 53 Luzerne Road.

GE points to the September 24, 1980 letter from DEC Commissioner Flacke to

GE, which acknowledged that GE had not "been in any way a party to the Department's

removal of soils and debris from properties in the West Glens Falls area and the

Department's design and construction of the [containment cell] for the placement of

these soils and debris."  Dkt. No. 46-8 at 41 (Dkt. No. 46-3 at 180-82).   Indeed, the

record supports that GE was not involved in the process of designing the containment

cell, choosing its location, or otherwise.  Id.  GE paid the State $320,000 "to reimburse

DEC for removing soils and debris from the Residential Properties and AMG site, and to

design and construct the PCB Landfill on 51 Luzerne Road."  Dkt. No. 46-1 at 12.

---

[36]  The State does not directly address GE's 51 Luzerne Road argument, as it had argued that 51 and 53 Luzerne together were a "Site," and, thus, does not in detail address whether GE could be found to have arranged hazardous waste at 51 Luzerne, as its own facility, separate from 53 Luzerne.

However, GE has admitted that it did clean remove, transport, and treat leachate from the containment cell at 51 Luzerne Road from 1980 to 1985. Dkt. No. 49-1 at 17 (citing 46-3 at 292). Further, the evidence supports that the vast majority the waste in the containment cell was from the Alkes scrapyard.

Thus, there are disputed questions of material fact as to whether, GE's actions in paying for the construction of the containment cell at 51 Luzerne and maintaining the cell by treating the leachate at the cell for five years, amounts to a sufficient nexus to find GE liable as an arranger of hazardous waste at 51 Luzerne. Even if the Court were able to be determine, as a matter of law, that GE had a sufficient nexus to 51 Luzerne Road, much as the Court finds that there remains material questions of fact as to whether GE had the requisite intent to dispose of hazardous substances at 53 Luzerne, the same factual questions remain as to 51 Luzerne – whether GE intended to dispose of hazardous waste when it sold scrap capacitors to Mr. Alkes for potential profit.

Accordingly, GE's motion for summary judgment, and the State's motion for partial summary judgment, on this ground are denied.

### 3. Remaining Claims

As the Court concludes that there are material questions of fact precluding summary judgment on the issues of whether GE arranged for the disposal of hazardous substances at 51 and 53 Luzerne Road, the Court declines to reach the remaining arguments in GE's motion for summary judgment: (1) whether the State can be held liable under CERCLA §§ 107(a) and 113(f)(1) for costs associated with the clean up of

51 and 53 Luzerne Road; (2) whether the State is liable under CERCLA § 107(a)(3) for causing the release of hazardous substances at 53 Luzerne Road; and (3) whether the State's response costs, if awarded, should be reduced as inconsistent with the National Contingency Plan.  See Dkt. No. 48-6 at 44-52.  As a determination of those issues is dependent upon the question whether GE can be held liable as an arranger of hazardous substances at 51 and 53 Luzerne Road, the Court cannot reach the remaining issues.  Accordingly, the motions for summary judgment on all claims not otherwise addressed herein are denied.

## III.  CONCLUSION

**WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that plaintiffs' motion for partial summary judgment, Dkt. No. 47, is **DENIED**; and it is further

**ORDERED**, that defendant's motion for summary judgment on all causes of action, Dkt. No. 46, is **GRANTED in part**, to the limited extent that plaintiffs' third cause of action, "Restitution/Unjust Enrichment" (Compl. at 17-18), is **DISMISSED** as time-barred, and the motion is otherwise **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 31, 2017
  Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

61